HAPPY DACK TRADING COMPANY, LIMITED and Main Fair Trading Company, Limited, Plaintiffs,

v.

AGRO–INDUSTRIES, INC., Mayer Rooz and Joshua Sternhell, Defendants.

AGRO–INDUSTRIES, INC., Mayer Rooz and Joshua Sternhell, Third-Party Plaintiffs,

v.

CHONG KING FAN, Kenneth S.K. Li and Edward Wu, Third-Party Defendants.

No. 83 Civ. 3134 (RLC).

United States District Court, S.D. New York.

Dec. 12, 1984.

Cleary, Gottlieb, Steen & Hamilton, New York City, for plaintiffs and third-party defendants; Richard F. Ziegler, Lawrence B. Friedman, New York City, of counsel.

Mandel, Weiss, Campise, Eisenberger & Mandel, New York City, for defendants and third-party plaintiffs; Steven Norman Weiss, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

This is a motion by plaintiffs for summary judgment in a breach of contract action, and for dismissal of defendants' RICO counterclaim.

These are the facts, according to plaintiffs:

Between July and November, 1982, plaintiff Main Fair Trading Company, Ltd. ("Main Fair"), a Hong Kong trading company, entered into six contracts with two trading agencies of the People's Republic of China requiring Main Fair to provide the People's Republic with two types of low-density polyethylene resin manufactured by ARCO Polymers, Inc. ("ARCO"), specifically, 14,000 metric tons of the resin known as ARCO 2020F and 3,000 metric tons of the resin known as ARCO 1000F.[1]

Each time Main Fair entered into a contract with the People's Republic, plaintiff Happy Dack Trading Company, Ltd. ("Happy Dack") another Hong Kong trading company and Main Fair's joint venture partner, entered into a corresponding contract with defendant Agro-Industries, Inc. ("Agro"), a New York export-import company wholly owned by defendants Mayer Rooz and Joshua Sternhell, under which Agro agreed to supply Happy Dack with the resin that Main Fair would sell to the People's Republic. Between July and November, 1982, Agro and Happy Dack entered into five[2] agreements by telex, stating that Agro would sell Happy Dack 14,000 metric tons of ARCO 2020F and 3,000 metric tons of ARCO 1000F for shipment to the People's Republic.[3] These telexes

---

1. The principal terms of these contracts may be summarized as follows:

| Contract No. | Date | Product | Amount (in metric tons) | Ship From | Ship To |
|---|---|---|---|---|---|
| 82XMK769328MR | 7/19/82 | Arco 2020F | 1000 | Houston | Shanghai |
| 82XEK769329MR | 7/19/82 | Arco 2020F | 1000 | Houston | Dalian |
| 82RX–6062K | 9/6/82 | Arco 2020F | 3000 | Houston | Shanghai |
| 83XEK769024CK | 9/25/82 | Arco 2020F | 3000 | Houston | Hsinkang |
| 83XEK769144MR | 10/31/82 | Arco 1000F | 3000 | U.S.ports | Shanghai |
| 83XEK769145MR | 10/31/82 | Arco 2020F | 6000 | U.S.ports | Whampoa |

2. The six Main Fair-People's Republic contracts correspond to only five Happy Dack-Agro contracts because the first Happy Dack-Agro contract refers to the first two Main Fair-People's Republic contracts.

3. The principal terms of these contracts may be summarized as follows:

| Date | Product | Amount (in metric tons) | Price | Contract No. |
|---|---|---|---|---|
| July 1982 "First Contract" | Arco 2020F | 2000 | $1,091,720 | 82XMK769328MR and 82XEK769329MR |
| Sept. 1982 "Second Contract" | Arco 2020F | 3000 | $1,899,240 | 82RX6062K |
| Sept. 1982 "Third Contract" | Arco 2020F | 3000 | $1,928,640 | 83XEK769024CK |
| Nov. 1982 "Fourth Contract" | Arco 1000F | 3000 | $1,960,200 | 83XEK769144MR |
| Nov. 1982 "Fifth Contract" | Arco 2020F | 6000 | $3,920,400 | 83XEK769145MR |

also state that payment to Agro under each agreement was to be made by drawings under an irrevocable letter of credit opened by Main Fair in Agro's favor, confirmed by a bank in New York; that the resin would be shipped directly to the People's Republic in five-ply paper bags with a one-ply polyethylene liner; that each shipping bag would be marked with the number of the contract between Main Fair and the People's Republic to which the shipment related; and that for each shipment Agro would supply a certificate of quality, quantity and weight issued by ARCO.

On November 30, 1982, representatives of Happy Dack, Main Fair and Agro met in Agro's offices in New York and executed five written contracts on Agro letterhead memorializing the agreements already reached by telex. Each contract identifies the telexes on which it is based, and the terms of the contracts parallel the terms of the telexes.

Under the first contract, Agro shipped 1,000 metric tons of resin to Shanghai and 913.544 metric tons to Dalian in late October, 1982. The next month, Agro shipped to Shanghai 2,189.82 of the 3,000 metric tons called for in the second contract. As required by the contracts, Agro delivered manufacturer's certificates of quality, quantity and weight with each shipment. The certificates, which appear to be on ARCO letterhead, purport to be ARCO's representation that the product shipped to the People's Republic was ARCO 2020F, with a uniform melt index of 2.0 and a density of 0.918.

Agro was paid $1,044,527.12 for the amounts it shipped under the first contract and $1,393,271.26 for the amounts it

shipped under the second contract, upon presentation of the required documents (including the ARCO certificates) to the New York bank which had confirmed the letters of credit.

The shipments sent under the first contract arrived in Dalian on January 7, 1983, and in Shanghai two days later. On January 17, Agro sent Happy Dack a telex stating Agro would not be able to ship any more resin under the third, fourth or fifth contracts because ARCO had stopped manufacturing low-density polyethylene resin and had sent Agro a claim of force majeure under Agro's existing contracts with ARCO.[4]

Happy Dack replied by telex that it would hold Agro to the contracts since Agro had told Happy Dack that Agro had pre-existing commitments from ARCO for the delivery of the full amount of the resin. Happy Dack also notified Agro in this telex that it had received advance word from the People's Republic that the resin already shipped did not conform to specifications.

The first shipments of resin had been inspected shortly after they arrived in the People's Republic. Analysis showed that the resin varied substantially from the product specifications for ARCO 2020F. The Chinese inspectors found that the melt indices diverged widely even within small samples, the density was not as specified, the resin was discolored, the bags were improperly marked, and the shipments were damaged because of poor packaging. The People's Republic notified Main Fair that the resin could not be used for its intended purpose[5] and that they were rejecting it. Happy Dack notified Agro of the People's Republic's rejection and itself

**4.** Agro said it would try to ship the balance due under the second contract.

**5.** The People's Republic had intended to convert the resin into a thin film, for agricultural purposes. Because of the large variance in the melt index even within individual samples of the

resin shipped by Agro, substantial portions of the resin either could not be made into film at all, or the resulting film would have holes, carbonized spots and blobs of resin that would not melt. (Li Declaration ¶ 5).

rejected the product. Agro replied by telex that Happy Dack's claims were speculative and unfounded, and warned Happy Dack to stop "harassing [Agro] with all these lies and inuendos [sic]." To date, Agro has not shipped the balance of resin due on the second contract, or any resin under the third, fourth or fifth contracts.

After learning of the People's Republic's rejection of the resin, Kenneth Li, assistant manager of Main Fair, traveled to Beijing, Dalian, Shanghai and Xian to investigate the claims made by the Chinese inspectors. Li inspected the shipments and collected samples which he then submitted for analysis to a Hong Kong laboratory. Li's findings and the laboratory report confirmed the Chinese inspectors' findings.

Main Fair investigated the possibility of mitigating damages by taking the off-grade resin back from the People's Republic for resale in international markets and repurchasing conforming resin for delivery to the People's Republic. This alternative proved very costly, however, so Main Fair negotiated a settlement with the People's Republic under which the People's Republic agreed to keep the resin shipped and Main Fair agreed to pay the People's Republic $895,148.49 over eight months as compensation for the nonconformities.

Plaintiffs are now suing to recover the $895,148.49 plus interest, $15,441.17 in travel and incidental expenses, and $130,800 in lost profits on the resin not delivered under the second, third, fourth and fifth contracts.

Defendants admit that they exchanged telexes with Happy Dack between July and November, 1982 for sale of ARCO 2020F and ARCO 1000F. (Defendants' Rule 3(g) Statement ¶ 3). They concede that the telexes state the contract terms and conditions asserted by the plaintiffs, (id.), and that on November 30, 1982, the parties signed five written documents which purport to be contracts. (Defendants' Rule 3(g) Statement ¶ 4). Defendants also admit that the resin they shipped to the People's Republic of China was not manufactured by ARCO and did not conform to the speci-

fications included in the Agro-Happy Dack telexes or contracts. (Sternhell Deposition at 156). They admit that they forged the ARCO manufacturer's certificates of quality, quantity and weight, (Rooz Deposition at 144–46), and that they were paid $2,437,798.38 for the off-grade resin they shipped. (Defendants' Rule 3(g) Statement ¶ 8).

Defendants contend, however, that their conduct was in furtherance of a prior oral agreement they had entered into with Happy Dack and Main Fair to sell the People's Republic non-ARCO off-grade resin while telling the People's Republic that the resin was ARCO 2020F and ARCO 1000F. Defendants assert that plaintiffs told them that off-grade resin was perfectly acceptable to the ultimate users in the People's Republic, but that government officials in Beijing insisted on documentation indicating that only prime virgin resins were being shipped.

Defendants state that the telexes sent by Agro to Happy Dack showing that Agro had agreed to ship to the People's Republic quantities of ARCO 2020F and ARCO 1000F were actually dictated to Agro by Happy Dack and Main Fair personnel in the course of several telephone conversations. Defendants claim that Happy Dack and Main Fair told them they wanted those telexes in their files in case the Chinese agencies ever sought to review Main Fair's and Happy Dack's records. Similarly, defendants state that the documents they signed on November 30, 1982, were not contracts at all, but rather an elaborate cover for the actual oral contract between Agro and Happy Dack to ship off-grade resin to the People's Republic. Though defendants admit forging the ARCO certificates, they state that Happy Dack and Main Fair personnel suggested the forgery, supplied Agro with blank ARCO letterheads, and provided Agro with a model ARCO certificate with the names of ARCO officials to forge.

In short, defendants contend that the type of resin they shipped to the People's Republic was precisely the type of resin actually ordered by Happy Dack and that

there was no breach of contract. They argue that the motion for summary judgment should be denied since a genuine issue of fact remains as to whether the telexes and written documents constitute the true meeting of the minds between the parties.

Defendants have also filed a RICO counterclaim against plaintiffs and three of their employees, alleging that they engaged in a pattern of racketeering activity, 18 U.S.C. § 1961, using mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, to injure Agro and the People's Republic.

Plaintiffs deny that there ever was a prior oral agreement to ship low-grade resin to the People's Republic.

## DISCUSSION

### 1. *Parol Evidence*

Ordinarily, where, as here, the parties dispute material facts, summary judgment is inappropriate. *See Heyman v. Commerce and Industry Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975). However, plaintiffs here argue that defendants' version of the facts is barred by the parol evidence rule, so that plaintiffs are entitled to summary judgment as a matter of law.

■ The parol evidence rule is a rule of substantive law of the State of New York.[6] Under the parol evidence rule the clear and unambiguous terms of a valid, integrated written instrument cannot be contradicted or varied by prior or contemporaneous extrinsic oral or written evidence. *Barclays Bank of New York v. Goldman,* 517

F.Supp. 403, 411 (S.D.N.Y.1981) (Cannella, J.).

■ In determining whether the parol evidence rule applies to this case the first issue to be resolved is whether the Agro-Happy Dack telexes and written agreements were integrated. I find that they were. "[U]nder New York law a contract which appears complete on its face is an integrated agreement as a matter of law." *Battery S.S. Corp. v. Refineria Panama, S.A.,* 513 F.2d 735, 738 n. 3 (2d Cir.1975). The telexes on their face purport to express the complete agreement of the parties. They include provisions covering the nature of the product, quantity, unit price, total value, packing requirements, manufacturer, date of shipment, port of loading, method of payment, and certificate of quality, quantity and weight. The November, 1982 written contracts likewise appear complete; they track the telexes provision by provision, and each contract refers to the telex on which it is based. Even defendants have not argued that the writings do not appear to be complete.

The court also finds that the terms of the writings are clear and unambiguous. Defendants argue that two of the contracts dated November 30, 1982, are unclear in that they call for shipments to occur in August and September, 1982, respectively, before the contract date. Defendants assert that parol evidence is necessary to explain this back-dating. The August and September delivery dates do not render the contract terms unclear or ambiguous, especially in light of the fact that the contracts memorialize and refer specifically to agree-

---

**6.** The parties agree that New York law applies in this case. Under *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed.2d 1477 (1941), we must apply New York's choice-of-law rules. In contract disputes, New York courts apply the law of "that state which has the greatest interest in or most significant relationship to the transaction and the parties." *Index Fund, Inc. v. Insurance Co. of North America,* 580 F.2d 1158, 1162 (2d Cir.1978), *cert. denied,* 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1979); *Intercontinental Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 382–85, 300 N.Y. S.2d 817, 825–28, 248 N.E.2d 576, 584–87 (1969).

In the instant case, New York is the only jurisdiction with which both defendants and plaintiffs have had contacts. The written contracts were executed in New York. Defendants arranged for the shipment of resin to the People's Republic in New York with New York suppliers. Moreover, New York as an international financial capital has a great interest in having its law applied to this case. *J. Zeevi and Sons, Ltd. v. Grindlays Bank (Uganda) Ltd.,* 37 N.Y.2d 220, 227, 371 N.Y.S.2d 892, 898, 333 N.E.2d 168, 174, *cert. denied,* 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975).

ments contained in telexes exchanged *before* the delivery dates.

Defendants' offered defense thus falls squarely within the scope of the parol evidence rule. Defendants seek to introduce evidence of prior oral agreements to alter clear and unambiguous terms—chiefly, the terms concerning specifications and manufacturer of the resin—in integrated writings.

■ Defendants argue, however, that the parol evidence rule does not bar their defense. They note, quite rightly, that the rule does not keep out parol evidence offered to show that a writing which purports to be a contract is not a contract at all, but merely a sham. *See, e.g., Bernstein v. Kritzer*, 253 N.Y. 410, 415–16, 171 N.E. 690, 242 N.Y.S.Appdx. (1930); *Arner v. Arner*, 89 App.Div.2d 899, 453 N.Y.S.2d 716 (2d Dept.1982). Defendants contend that the real Agro-Happy Dack agreement was oral, and that the telexes and written contracts were merely shams. They argue that parol evidence offered to prove that should not be barred.

■ While New York courts have held that parol evidence is admissible to show that a contract is not a contract but a sham, "that principle is predicated on proof of the intention of the parties that the entire contract was to be a nullity, not as here that only certain provisions of the agreement were not to be enforced ... but that other provisions were to be enforcible." *Bersani v. General Accident Fire &* *Life Assurance Corp.*, 36 N.Y.2d 457, 461, 369 N.Y.S.2d 108, 112, 330 N.E.2d 68, 72 (1975). *See also Kirtley v. Abrams*, 299 F.2d 341, 345 (2d Cir.1962) (although parol evidence is admissible to show that "there never was any agreement such as the writing purported to be," parol evidence is inadmissible to vary certain terms of a written agreement); *Meinrath v. Singer Co.*, 482 F.Supp. 457, 460 (S.D.N.Y.1979) (Weinfeld, J.), *aff'd mem.*, 697 F.2d 293 (2d Cir.1982) (although parol evidence is admissible to prove fraud, proof must be offered to show intention of the parties that the entire contract was to be a nullity and not that certain provisions were not to be enforced).

Defendants do not contend that there was no contractual relationship at all between the parties. They concede "that contracts existed between Agro and Happy Dack requiring shipment of polyethylene resin...." (Answer at ¶ 19). In effect, defendants seek to leave intact some terms of the writings—the general subject matter, the prices, the destinations—while altering several other terms—the manufacturer and specifications of the resin. In fact, defendants acted on the terms of the written contracts in shipping to Dalian and Shanghai and in receiving payment through Main Fair's letter of credit. Since defendants seek to introduce parol evidence to alter a handful of terms in the contracts and not to demonstrate that the entire contracts are nullities, defendants' offered defense is barred as a matter of law.[7] *See*

---

**7.** There are two other possible grounds for deciding that defendants' offered defense is not sufficient to prevent summary judgment for the plaintiffs.

First, the New York Court of Appeals has held that "when the outcome of the admission of parol evidence, to the effect that the parties to the written contract ... did not intend it to be an agreement of any force or efficacy, *would be contrary to law and public policy*, such proof would be inadmissible and the written contract ... would be enforced according to its terms...." *Bersani, supra*, 36 N.Y.2d at 460–61, 369 N.Y.S.2d 108, 330 N.E.2d 68 (citations omitted) (emphasis added). Plaintiffs in this case argue that the parol evidence is being offered to demonstrate that there existed a scheme to defraud People's Republic. Since such a scheme would be against law and public policy of New York, they claim, the parol evidence should be barred. This court, interpreting New York case law, has recently suggested that parol evidence will be barred on grounds of public policy only in cases which "involve the deception of a public institution and the contravention of clear public policy," and not in cases which "involve the deception of a private third party who consequently suffer[s] harm that is either negligible or uncertain." *Bank of America National Trust and Savings Association v. Gillaizeau*, 593 F.Supp. 239, 244 (S.D.N.Y. 1984) (Goettel, J.). Since we have already held that the parol evidence is barred as a matter of law on other grounds, we need not reach the question whether the parol evidence in this case would be barred under the *Gillaizeau* standard or whether the *Gillaizeau* standard should be respected.

*Lewis v. Owens*, 338 F.2d 740 (6th Cir.1964) (parol evidence inadmissible to show that wage agreements were shams where plaintiff already acted on the agreements by making wage payments).

■ In the absence of defendants' offered defense, there is no dispute as to any fact material to plaintiffs' breach of contract claim. There is no dispute that (1) contracts were formed between Happy Dack and Agro, (2) Happy Dack performed by having Main Fair establish the letter of credit in Agro's favor, (3) Agro shipped non-conforming resin and then shipped no resin at all,[8] and (4) Happy Dack and Main Fair were damaged as a result of Agro's action. Consequently, plaintiffs are entitled to summary judgment as a matter of law. *See, e.g., United States v. Wallace & Wallace Fuel Oil Co.*, 540 F.Supp. 419 (S.D.N.Y.1982) (Duffy, J.) (parol evidence barred defense in contract action, entitling plaintiff to summary judgment).

*2. Damages*

Plaintiffs are claiming damages for the delivery of the nonconforming resin, for incidental expenses, and for lost profits on the contracts under which Agro shipped no resin at all.[9]

Damages for delivery of nonconforming resin are measured by the "difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." N.Y.U.C.C. § 2–714(2). "The buyer's direct damages are not limited to the measure of damages set forth in UCC § 2–714(2). Official Comment 3 makes clear that UCC § 2–714(2) describes the usual standard and a reasonable method for calculating damages in the event of a breach, but is not intended as an exclusive measure of damages. Read together, subsections (1) and (2) of § 2–714 provide that plaintiff may recover for its direct damages

The second alternative grounds on which to award plaintiffs summary judgment is that defendants' offered defense, even if admissible, would not be sufficient to bar summary judgment. Defendants have offered no documentary evidence, no testimony from non-party witnesses, no affidavits—nothing beyond their own conclusory allegations—to support their story. "When, as here, the movant for summary judgment introduces evidence demonstrating that his adversary's claim is baseless, the opposing party cannot rely on mere conclusory allegations to defeat that motion. Rather, he must offer specific facts showing that there is a genuine issue for trial." *Ritz v. United States*, 573 F.Supp. 234, 235 (S.D.N.Y.1983) (Carter, J.). What is more, defendants' "claim is effectively repelled by documentary evidence including [defendants'] own writings." *Meinrath v. Singer, supra*, 482 F.Supp. at 460. For example, if, as defendants contend, the real agreement was to ship approximately *4,000* metric tons of resin to the People's Republic (Defendants' Rule 3(g) Statement ¶ 6), why would defendants exchange telexes and sign contracts for the sale of *17,000* metric tons—even if these documents were meant as window dressing to protect Happy Dack and Main Fair, as defendants claim? Similarly, if both Agro and Happy Dack knew that the resin did not conform to ARCO specifications, why would Agro respond to Happy Dack's notification of the resin's nonconformity by accusing Happy Dack of uttering "lies and inuendos [sic]?" Again, since we have found defendants' assertions inadmissible as a matter of law, we need not reach the question whether, if admitted, defendants' allegations would be sufficient to prevent summary judgment for plaintiffs.

8. Defendants do not contend, as their January 17, 1983 telex to Happy Dack might suggest, that their non-performance should be excused because of ARCO's claim of force majeure with respect to the resin due under the second through fifth contracts. Defendants do not argue here that ARCO *really* made a claim of force majeure (which might excuse non-performance, though we do not reach the question). In fact, defendants do not state they ever really had a contract with ARCO at all. Rather, defendants claim that plaintiffs dictated the force majeure message to them, and asked defendants to send that message for plaintiffs to have in their files. (Sternhell Deposition at 225–26).

9. In their Rule 3(g) Statement, defendants dispute plaintiffs' claims regarding damages (¶¶ 10–13). Defendants, however, offer no specific facts; they merely state that they lack firsthand knowledge of plaintiffs' dealings with the People's Republic and therefore dispute the claims of damage. This is insufficient to defeat a motion for summary judgment. *See, e.g., Ritz v. United States, supra* n. 7.

in any manner which is reasonable." *American Electric Power Co. v. Westinghouse Electric Corp.*, 418 F.Supp. 435, 454 n. 34 (S.D.N.Y.1976) (Carter, J.).

■ Here, plaintiffs are seeking to recover $895,148.49, the amount they paid the People's Republic of China in compensation for retaining the nonconforming resin. Since this amount was fixed pursuant to arm's length bargaining (Li Declaration ¶ 17), it may be considered the difference in fair market value between conforming and nonconforming resin. Moreover, relying on § 2–714(2), this court has held that under New York law when a seller delivers nonconforming goods to ultimate buyers, the intermediate buyer may claim as damages the amount it had to pay the ultimate buyers to compensate them for the delivery of the defective goods. *Rite Fabrics, Inc. v. Stafford-Higgins Co., Inc.*, 366 F.Supp. 1 (S.D.N.Y.1973) (Levet, J.). Accordingly, plaintiffs are entitled to recover $895,-148.49, plus interest. Since the loss plaintiffs incurred in this case was pecuniary loss from having to pay People's Republic's compensation, interest should be computed from the date payment was made. *Mount Sinai Hospital v. Borg-Warner Corp.*, 527 F.Supp. 922, 925–26 (S.D.N.Y.1981) (Weinfeld, J.). *See also Re Estate of Kummer*, 93 App.Div.2d 135, 461 N.Y.S.2d 845 (2d Dept.1983); *Gelco Builders and Burjay Construction Corp. v. Simpson Factors Corp.*, 60 Misc.2d 492, 301 N.Y.S.2d 728 (Sup.Ct.N.Y.Co.1969). As payment to the People's Republic of China was made in installments, interest will be computed separately for each installment from the date it was paid. NYCPLR § 5001(b).

Pursuant to N.Y.U.C.C. § 2–715(1), which allows "expenses reasonably incurred in inspection ... of goods rightfully rejected", plaintiffs are also entitled to the $15,441.17 in travel and testing expenses incurred by Li after the People's Republic of China rejected the resin.

■ In addition, plaintiffs seek $130,800 in lost profits as a result of defendants'

failure to complete their shipments under the second contract and to make any shipments whatsoever under the third through fifth contracts. "[I]n appropriate cases of contract breach, New York law will grant lost profits in its computation of damages." *Joneil Fifth Avenue, Ltd. v. Ebeling & Reuss Co.*, 458 F.Supp. 1197, 1201 (S.D.N.Y.1978) (Weinfeld, J.). Where, as here, the buyer seeks to recover profits lost when the seller failed to deliver goods that the buyer had intended to resell at a profit, the buyer must show that "the seller at the time of contracting had reason to know" that buyer would lose profits, and that the lost profits "could not be reasonably prevented by cover or otherwise," for instance, by purchasing substitute goods in the open market for resale. N.Y.U.C.C. § 2–715(2)(a), *cited in Bende & Sons, Inc. v. Crown Recreation, Inc.*, 548 F.Supp. 1018, 1022 (E.D.N.Y.1982), *aff'd mem.*, 722 F.2d 727 (2d Cir.1983) *and in Harbor Hill Lithographing Corp. v. Dittler Brothers, Inc.*, 76 Misc.2d 145, 348 N.Y.S.2d 920 (Sup. Ct.Nassau Co.1973). In this case, the first requirement of § 2–715(2)(a) is satisfied: defendants admit they knew plaintiffs meant to resell the resin to the People's Republic of China at a profit; defendants even shipped the resin directly to People's Republic ports. Moreover, Comment 6 to § 2–715 provides: "In the case of sale of wares to one in the business of reselling them, resale is one of the requirements of which the seller has reason to know within the meaning of subsection (2)(a)." The second requirement of § 2–715(2)(a), however, is not satisfied in this case. Plaintiffs could have prevented—at least partially— the loss of profits by purchasing conforming resin in the open market and reselling it to the People's Republic. The difference between the market price and the contract price with Agro, if any, would have been recoverable as standard contract damages. N.Y.U.C.C. § 2–713. But plaintiffs do not allege that they tried and were unable to cover by buying conforming resin for resale.[10] Consequently, lost profits cannot be awarded.

---

10. Main Fair's Kenneth Li does state that after

nonconforming resin was delivered under the

### 3. *RICO*

[redacted] Defendants' RICO counterclaim must fail in light of the Second Circuit's recent rulings in *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 741 F.2d 482 (2d Cir.1984) and *Bankers Trust Co. v. Daniel Rhoades*, 741 F.2d 511 (2d Cir.1984). In those cases, the Second Circuit held that RICO requires "that the plaintiff show injury different in kind from that occurring as a result of the predicate acts themselves, or not simply caused by the predicate acts, but also caused by an activity which RICO was designed to deter." *Sedima, supra,* at 496. (The type of activity RICO was designed to deter is the use of a pattern of racketeering activity "to invest in, control, or conduct, a RICO enterprise." *Bankers Trust, supra,* at 516.) In this case, defendants have alleged that they were injured not by the use of the pattern of racketeering activity in connection with a RICO enterprise, but rather by the predicate acts—the individual alleged acts of mail fraud and wire fraud that comprised the pattern of racketeering activity. Consequently, defendants have failed to state a RICO claim.

Moreover, the Second Circuit held in *Sedima, supra,* at 496, that a prior criminal conviction is a prerequisite to a civil RICO action. Defendants have not claimed that plaintiffs have been criminally convicted for any of the acts upon which the RICO claim is based. For this reason, too, defendants' RICO claim must fail.

## CONCLUSION

Plaintiffs' motion for summary judgment on the breach of contract claim is granted. Plaintiffs' claim for lost profits is denied. Defendants' RICO counterclaim is dismissed.

IT IS SO ORDERED.

[redacted]

first and part of the second contracts, he considered taking the nonconforming resin back from the People's Republic for resale and repurchasing conforming resin for delivery to the People's Republic, but rejected this idea because of "the high cost of collecting the nonconforming resin and transporting it to the People's Republic coast, the low price of offgrade resin in international markets and the rising price of conforming resin." (Li Declaration ¶ 16). Significantly, Li does not state that conforming resin was unavailable to substitute under the second through fifth contracts where no resin was delivered. The fact that the price of conforming resin was "rising" does not mean that it would have been impossible to prevent or mitigate the loss of profits. Even if the market price had been greater than the Agro-Happy Dack contract price, plaintiffs could have mitigated damages, so long as market price remained less than the Main Fair-People's Republic contract price. Without open market quotations, an award of lost profits on this motion for summary judgment would be improper.