**CARBONTEK TRADING CO., LTD. and Kermit A. Rosenberg,
Plaintiffs–Appellees,**

v.

**PHIBRO ENERGY, INC.,
Defendant–Appellant.**

No. 89–3736.

United States Court of Appeals,
Fifth Circuit.

Sept. 6, 1990.

James B. Kemp, Jr., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., Luther T. Munford, Joseph A. Ziemianski, Phelps, Dunbar, Marks, Claverie & Sims, Jackson, Miss., for defendant-appellant.

Ralph E. Smith, Deutsch, Kerrigan & Stiles, New Orleans, La., for plaintiffs-appellees.

Before THORNBERRY, JOHNSON, and SMITH, Circuit Judges.

THORNBERRY, Circuit Judge:

This appeal involves a dispute over the amount of damages a seller, Carbontek Trading Company, Ltd. ("Carbontek"), owes to a buyer, Phibro Energy, Inc. ("Phibro"), as a consequence of Carbontek's delivery of a shipment of coal that did not conform to contract specifications. We find that the district court erred in holding Carbontek liable for less than the full amount of damages suffered by Phibro and in denying recovery to Phibro for delay expenses.

## FACTS AND PROCEDURAL HISTORY

Carbontek and Phibro are both corporations engaged in selling and trading coal in bulk. In March 1987, Carbontek and Phibro entered into a contract in which Carbontek agreed to sell and Phibro agreed to buy approximately 70,000 metric tons of steam coal at a price of $25 per ton. Phibro contracted to sell the cargo of steam coal to Elkraft Power Company, Ltd. ("Elkraft"), a Danish utility, for $31.95 per ton. Both contracts provided that the steam coal was to comply with certain listed specifications. Phibro chartered a vessel, the M/V SENECA, and was responsible for shipping the coal from its loading point at Davant, Louisiana, to Elkraft in Denmark.

The coal that Carbontek delivered at Davant had approximately 6,500 tons of petroleum coke ("pet coke") combined with it. Pet coke is a by-product of petroleum refining. Carbontek added the pet coke to the coal to meet its interpretation of the specifications of the contract. Many utility companies consider pet coke undesirable for burning because it contains less volatile matter than coal, and many coal-burning plants are not set up to burn low-volatility fuels. Pet coke can also create dust problems. Elkraft's labor contracts provided that Elkraft would not buy any pet coke.

On Wednesday, April 8, 1987, Carbontek, Phibro, and Elkraft each had a representative present at Davant to inspect the coal piles intended for Phibro and to observe loading of the coal aboard the M/V SENECA. Upon inspection of the cargo, Elkraft and Phibro discovered that it contained some pet coke. Carbontek began loading the cargo that evening, as scheduled. The next morning Phibro notified Carbontek by telex that Elkraft intended to reject the coal because of the presence of pet coke, and that Phibro was therefore rejecting the coal and holding Carbontek liable for any damages. Carbontek then stopped loading at 7:40 p.m. on April 9. On April 10 Phibro called upon Carbontek to discharge the blended coal and replace it with steam coal. Carbontek did not discharge the coal.

On Saturday, April 11, the M/V SENECA resumed loading. It is unclear who ordered the resumption of loading; it may have occurred because of a breakdown in communications over the weekend. Loading of a total cargo weight of 64,797.283 metric tons was completed at 6:00 a.m. on April 12.

The M/V SENECA left the dock on Sunday morning, April 12, and proceeded to a

point off the Louisiana coast, seaward of the Southwest Pass. There it remained anchored until 5:46 p.m. on April 14, when it departed toward Asnaes, Denmark, upon Phibro's instructions. At that time Phibro did not communicate with Carbontek other than to inform Carbontek that it should try to find an alternate buyer for the coal.

On April 15, 1987, Carbontek brought this action against Phibro in the United States District Court for the Eastern District of Louisiana, complaining that Phibro and its agent violated their duty to issue a bill of lading for the coal and that Phibro converted the coal to its own use.[1] Carbontek sought to recover the full contract price of the coal from Phibro, because Phibro had not paid for the coal at the time Carbontek filed suit.

Meanwhile, Phibro was negotiating with Elkraft to accept the cargo of steam coal and pet coke for a discounted price. On April 14, Phibro and Elkraft agreed that Elkraft would accept the full load for a reduction of $192,000 in the contract price, subject to final inspection in Denmark. On April 21, Phibro informed Carbontek of its tentative arrangement with Elkraft and indicated it would welcome any lower cost alternatives that Carbontek might have. Carbontek requested information as to the position, direction, and speed of the vessel so that it could locate an alternate buyer at a location to which the vessel could be diverted. On April 23 and again on May 1, Phibro informed Carbontek that the coal was scheduled to arrive at Asnaes, Denmark, on May 2. The M/V SENECA arrived at Asnaes on schedule.

While the vessel was sailing toward Denmark, Carbontek continued to negotiate with potential purchasers. On May 1, Carbontek received an offer of $33.25 per ton

through a broker in the United Kingdom for delivery in the eastern Mediterranean. Phibro never learned of this offer. On May 4, Carbontek asked Phibro to hold up discharge of the coal for 24 hours so it could confirm an offer of $32.50 per ton from a consignee in Hamburg, Germany. Phibro responded that it would hold up discharge only if Carbontek agreed to be responsible for any delay expenses and for cancellation of its agreement with Elkraft. Carbontek did not agree to take responsibility for the delay.

Elkraft took delivery of the coal on May 5 and thereafter paid Phibro the original contract price less $192,000. Phibro then paid Carbontek its contractually agreed price, less a deduction of $219,555.49: $192,000 for the reduction in Elkraft's price and $27,555.49 for expenses incidental to difficulties in loading the vessel and delays caused by the dispute over the pet coke.[2]

In July 1987, Carbontek filed for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia. The bankruptcy proceeding was later converted to a Chapter 7 liquidation proceeding. The interim trustee, Kermit A. Rosenberg, was substituted as plaintiff in Carbontek's place to prosecute this case on behalf of the bankrupt estate. After the bankruptcy judge granted Phibro leave to file a counterclaim against Carbontek in this action, Phibro filed a counterclaim for damages resulting from the contamination of the steam coal with pet coke and for delay expenses resulting from Carbontek's breach of contract.

The district court held a nonjury trial in March 1989, and thereafter entered findings of fact and conclusions of law. The court found that Carbontek violated the

---

1. Carbontek also named as defendants Tradax Ocean Transport, S.A. (time charterer of the M/V SENECA), Hall–Buck Marine, Inc. (agent for Phibro and Tradax in dealings with the vessel), and Shipping Management S.A.M. (owner of the vessel), *in personam*, and the M/V SENECA and the coal, *in rem*. The district court found that Hall–Buck Marine's delay in issuing a corrected bill of lading did not violate 46 U.S.C.App. § 193, which requires the owner of a vessel transporting merchandise to issue a

bill of lading to the shipper. The court then dismissed all defendants other than Phibro as not properly part of the litigation over the contractual dispute. These aspects of the district court's judgment are not challenged on appeal.

2. In fact, the record shows Phibro withheld $229,555.49 from its payment to Carbontek, or $10,000 more than it should have withheld according to its damages calculation.

perfect tender rule of New York Uniform Commercial Code ("UCC") section 2–601(a) by tendering contaminated coal to Phibro. The court found that Phibro initially rejected the coal, but later accepted it on May 5, when it consummated the sale to Elkraft. The court found that Phibro's acceptance was subject to its right to claim damages for the inclusion of approximately 10% pet coke, under UCC section 2–714. The damages would be the difference between the value of the goods delivered and their value had the cargo not been controverted, and under UCC section 2–717, Phibro could deduct such damages from the price due under the contract.

The court found, however, that the amount Phibro deducted was excessive. The court concluded that, because Carbontek "apparently received offers" close to the original Elkraft contract price from other buyers relatively near Denmark, a reasonable deduction would be $50,000. The court disallowed the delay expenses of $27,555.49, saying that those damages were the result of Phibro's own delay. Therefore, the court awarded Carbontek damages in the amount of $169,555.49 plus interest. Phibro appeals the damage award.

## DISCUSSION

On appeal, the only issue is the amount of damages that Phibro should recover for Carbontek's breach. Carbontek does not dispute the district court's conclusion that Carbontek breached the contract when it violated the perfect tender rule.

Phibro urges that the district court should have awarded it the full $219,555.49 in damages. Carbontek agrees with the district court's award. Both parties agree that New York law applies to their dispute, in accordance with a provision in the Carbontek/Phibro contract.

*A. Damages for the Reduced Value of the Coal as Delivered*

New York UCC section 2–714 determines the manner in which a buyer who accepts defective goods and gives notice is entitled to recover damages:

(1) Where the buyer has accepted goods and given notification (subsection (3) of Section 2–607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next section may also be recovered.

N.Y.U.C.C. Law § 2–714 (McKinney 1964). The buyer is entitled to deduct the damages from the price due under the contract. N.Y.U.C.C. Law § 2–717; *Created Gemstones, Inc. v. Union Carbide Corp.*, 47 N.Y.2d 250, 391 N.E.2d 987, 989, 417 N.Y. S.2d 905, 907–08 (1979). Phibro deducted its alleged damages from the price due to Carbontek under the contract in accordance with section 2–717.

■ Phibro argues that $192,000 is a reasonable calculation of the difference in fair market value between the conforming and nonconforming coal, because that is the reduction in Elkraft's price that Elkraft required in return for accepting the nonconforming coal. Under New York law, "when a seller delivers nonconforming goods to ultimate buyers, the intermediate buyer may claim as damages the amount it had to pay the ultimate buyers to compensate them for the delivery of the defective goods." *Happy Dack Trading Co. v. Agro–Industries, Inc.*, 602 F.Supp. 986, 994 (S.D.N.Y.1984) (citing *Rite Fabrics, Inc. v. Stafford–Higgins Co.*, 366 F.Supp. 1 (S.D.N.Y.1973)). In *Happy Dack*, the court accepted as a reasonable measure of damages a specified amount of compensation that an intermediate buyer of resin agreed to pay the ultimate buyer in exchange for the ultimate buyer's agreement to keep the defective resin. Because the parties fixed

the amount of compensation pursuant to arm's length bargaining, the court concluded that that amount could be considered the difference in fair market value between conforming and nonconforming resin. *Happy Dack*, 602 F.Supp. at 994. Phibro argues that the district court should have applied the same principle in this case.

The district court found that the terms of the arrangement between Phibro and Elkraft did not indicate that Elkraft's deduction was considered to be a measure of damages. Carbontek also disputes the relevance of the arrangement as evidence of the coal's value, and argues that Phibro never showed any correlation between the discounted price paid by Elkraft and any actual damage sustained by Phibro or Elkraft. But the telex dated April 15 from Phibro's agent in Stockholm to Elkraft, confirming Phibro's agreement with Elkraft, says, "As full compensation for the contamination of petcoke we will from the invoice value deduct a lump sum of USD 192,000." According to Phibro, the district court erred in overlooking this sentence, which indicates that the $192,000 deduction was intended to represent the difference in value between the coal as warranted and the coal as accepted. A previous telex dated April 14 from Phibro's agent in Stockholm to Phibro's main office in Greenwich, Connecticut, indicates that the $192,000 figure was calculated by multiplying $32 per ton (an approximation of the contract price Elkraft was to pay) by 6,000 tons of pet coke.[3]

The district court relied on Phibro's telex of April 15 for its factual finding that Elkraft agreed to accept the contaminated coal "as full performance under [the] contract," but seems to have ignored the subsequent language of the telex describing the deduction as compensation for contamination. We think the telex is competent evidence that the $192,000 deduction was intended to compensate for the contamination. The testimony of John Dallin, a director of Phibro, also indicates that the

deduction was compensation for contamination. Carbontek did not offer any evidence indicating that the agreement between Phibro and Elkraft was anything other than an arm's length agreement. In accordance with *Happy Dack*, therefore, we think $192,000 is a reasonable measure of Phibro's damages. *See Happy Dack*, 602 F.Supp. at 994. The district court's finding that no evidence showed Elkraft and Phibro considered the $192,000 to be a measure of damages is clearly erroneous.

 As a breaching seller, Carbontek had the burden to show that Phibro could have mitigated its damages in a commercially reasonable manner. *See City of New York v. Pullman Inc.*, 662 F.2d 910, 917 (2d Cir.1981), *cert. denied*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982) (although an injured buyer is under a duty to mitigate damages, the burden is on the breaching seller to show that its alternative option "was a viable means of reducing damages"); *Larsen v. A.C. Carpenter, Inc.*, 620 F.Supp. 1084, 1132 (E.D.N.Y. 1985), *aff'd*, 800 F.2d 1128 (2d Cir.1986) (the burden of showing failure to mitigate is on the wrongdoer). Carbontek did not meet this burden. Carbontek did not offer any evidence showing that the Phibro/Elkraft agreement was not commercially reasonable or that a less expensive option was available to Phibro.

Carbontek argues that a less expensive solution, such as replacing the coal at the loading dock, might have been feasible if Phibro had remained in contact with Carbontek all along. Phibro did not communicate with Carbontek between April 10 and April 21 about the efforts Phibro was making to replace the coal or find alternate buyers, and only contacted Carbontek after Phibro had already tentatively settled with Elkraft. However, one of Phibro's witnesses, John Dallin, testified that discharging the contaminated coal alone would have cost $120,000. Additional costs mentioned by Phibro's witness included

---

**3.** Although the total quantity of pet coke was approximately 6,500 tons, 500 tons were mixed in with enough pure steam coal in one hold of the ship so that the pet coke did not significant-

ly affect the quality of that part of the cargo. Elkraft, therefore, paid the full price for that 500–ton quantity.

$6,000 per day for the ship's delay and dead freight of $6 per ton. Carbontek did not contradict any of this evidence. The only evidence Carbontek contradicted involved the timing of replacement: Phibro's witness estimated it would have taken two to three months to replace the cargo; Carbontek's witness testified it would have taken two weeks. There was some evidence that the market price of coal was rising and that ocean freight for a replacement cargo would have cost $1.50 per ton more than ocean freight under the M/V SENECA charter. Because the price of coal was higher than the price of pet coke, the price of coal was rising, and replacement coal probably would have cost more than any price received for the SENECA's blended cargo, it seems likely that discharging and replacing the cargo would have cost more than $192,000. We find nothing in the record to suggest otherwise.

Carbontek insists that it had two alternate offers at prices comparable to the Elkraft contract price, and that Phibro never gave Carbontek a chance to confirm an alternate offer because Phibro never notified it of the ship's speed and estimated time of arrival in Denmark. Without such information, Carbontek says it could not have provided a potential buyer with certainty as to delivery time. However, Carbontek's telex to a potential alternate buyer indicates that on April 28 Carbontek knew the M/V SENECA was five days from its destination. The two alternate offers came in after April 28.

Carbontek never showed that if Phibro had accepted one of the last-minute alternate offers, Phibro could have covered its obligation to Elkraft in a time frame acceptable to Elkraft and at a price that would have resulted in a mitigation of damages. Moreover, Phibro conditionally assented to delay unloading at Asnaes so that Carbontek could confirm an offer if Carbontek would take responsibility for any delay costs; when Carbontek failed to respond, Phibro allowed discharging to begin.

The district court found that a "reasonable deduction" would be $50,000 because Carbontek "apparently received" other offers for the coal similar to the original Elkraft price. However, the record does not support the $50,000 figure. Since the deduction of $192,000 from Elkraft's contract price is the only measure of damages for which there is any real evidence, and that amount seems commercially reasonable in these circumstances, we think $192,000 is a more appropriate measure of damages than the arbitrary figure of $50,000.

## B. Delay Expenses

The district court denied the recovery of incidental damages for delay that Phibro sought in the amount of $27,555.49, on the ground that these expenses were "the result of Phibro's own delay," not the result of the initial rejection of the cargo.

■ Under UCC section 2–714(3), a buyer who has accepted goods and given notification may recover, *inter alia*, any incidental damages caused by a nonconformity of tender. Section 2–715(1) provides a description of incidental damages:

> Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

N.Y.U.C.C. § 2–715(1) (McKinney 1964). The official comment indicates that this list of enumerated expenses is not exhaustive. N.Y.U.C.C. § 2–715(1) comment 1. Incidental damages can include all reasonable expenses the buyer incurred "in inspecting, shipping, handling and storing" the defective goods. *Consolidated Data Terminals v. Applied Digital Data Systems*, 708 F.2d 385, 393–94 (9th Cir.1983); *see also Happy Dack*, 602 F.Supp. at 994 (intermediate buyer could recover travel and testing expenses incurred after ultimate buyer rejected the goods).

Specifically, Phibro requests (1) $9,000.00 of demurrage, which is compensation to the vessel owner for any delay exceeding the loading time allowed by the contract—in this case, for the lapse in loading time at

Davant caused by the dispute over cargo quality; (2) $635.42 for lost dispatch, which is the contractual bonus Phibro would have earned for loading the vessel faster than scheduled but for the delays caused by the dispute; (3) $1,337.42 for lost interest on ocean freight that Phibro would have earned had it delivered the cargo as scheduled; (4) $14,766.40 in demurrage and additional costs to the vessel owners while the vessel waited at the Southwest Pass for sailing orders; (5) $554.25 for the cost of extra sampling and chemical analysis performed on the coal that was loaded on the vessel; and (6) $1,262.00 for extra pilotage and harbor expenses at Davant incurred because the vessel had to be moved between the loading dock and anchorage. These expenses incurred by Phibro are supported by documentary evidence and testimony. John Dallin, a director of Phibro, testified that Phibro paid all of these charges.

■ Carbontek does not dispute the validity of Phibro's expenses, but asserts that the delay causing the expenses to accrue was Phibro's fault. The district court accepted Carbontek's argument. Again, we disagree with the district court. Phibro incurred the enumerated expenses only because Carbontek's coal was nonconforming. The initial delay from April 9 to April 11 began when Carbontek stopped loading the ship in response to Phibro's initial exercise of its right to reject the cargo. Clearly, that delay resulted from Carbontek's breach of contract in delivering nonconforming coal.

The delay at the Southwest Pass from April 12 to April 14 occurred while Phibro was trying to mitigate damages by finding other buyers or concluding a settlement with Elkraft. The telex of April 14 from Phibro's agent in Stockholm to Phibro's main office in Greenwich, Connecticut, describes Phibro's unsuccessful attempts to find other buyers for the coal. The ship sailed as soon as Phibro concluded an agreement with Elkraft. Contrary to the district court's conclusion, the delay at the Southwest Pass resulted from the initial rejection of the cargo, and occurred only because Phibro was trying to mitigate damages. It was only because Carbontek delivered nonconforming coal that Phibro had to attempt to mitigate damages.

■ In its brief Carbontek notes that the contract excluded claims for consequential damages. The damages for delay claimed by Phibro, however, are not consequential damages, but incidental damages similar to those described in UCC section 2–715(1). Incidental damages may be recovered even when consequential damages are excluded. *See, e.g., Carbo Industries v. Becker Chevrolet*, 112 A.D.2d 336, 491 N.Y.S.2d 786, 790 (N.Y.App.Div.), *appeal dismissed*, 66 N.Y.2d 1035, 499 N.Y.S.2d 1030, 489 N.E.2d 1303 (1985) (towing costs and costs of diagnosing the problem were compensable incidental damages).

### CONCLUSION

Phibro's agreement with Elkraft for a discount of $192,000 as compensation for the contamination of the coal with pet coke does not seem commercially unreasonable. The record shows that Phibro unsuccessfully attempted to mitigate damages by finding other buyers. Moreover, Carbontek did not meet its burden to show that a less expensive option was viable, considering Phibro's obligation to Elkraft. The deduction of $192,000 from Elkraft's contract price is the only measure of Phibro's damages for which there is any real evidence. Therefore, we hold that Phibro is entitled to damages of $192,000.

Furthermore, Phibro's delay expenses of $27,555.49 were reasonable and should be awarded as incidental damages. The district court erred in finding that the expenses resulted from Phibro's own delay, since the delay occurred only because Phibro was trying to mitigate damages caused by Carbontek's breach.

Because the amount Phibro withheld from its payment to Carbontek was $229,555.49, or $10,000 more than it should have withheld, our modification of the district court's award of damages to Phibro does not result in a judgment that Carbontek take nothing. Carbontek is entitled to the

difference between the full contract price and the damages recovered by Phibro. Therefore, we render a judgment in favor of Carbontek for $10,000 plus prejudgment interest as described in the district court's judgment below, *i.e.*, at the rate of 6.30% from April 12, 1987 to entry of the district court's judgment, and postjudgment interest thereafter until paid. The judgment is AFFIRMED AS MODIFIED.