**COUNTY ASPHALT, INC., Plaintiff,**

v.

**The LEWIS WELDING & ENGINEER-ING CORPORATION, Defendant.**

**No. 66–Civ. 141.**

United States District Court,
S. D. New York.

Nov. 30, 1970.

Casey, Lane & Mittendorf, New York City, for plaintiff by William E. Kelly, trial counsel, Alan R. Wentzel, and James Shaughnessy, New York City, Smith, Ranscht, Pollock & Barnes, White Plains, N. Y., of counsel.

Alexander & Green, New York City, for defendant by Edward E. Rigney, trial counsel, Klaus H. Jander, Richard T. McDermott, and Bruce W. Eaken, of Jones, Day, Cockley & Reavis, Cleveland, Ohio, of counsel.

## MEMORANDUM

CROAKE, District Judge.

This is a diversity action, having been removed to this court by defendant, from the New York State Supreme Court, Westchester County. The case concerns among other issues, "transactions in goods" within the scope of the Uniform Commercial Code's article on sales,[1] which were purchased by plaintiff, a New York corporation, from defendant, an Ohio corporation.

On December 22, 1964, and January 19, 1965, the parties to this action executed in New York, four contracts[2] for. the purchase and installation of asphalt plants at two locations, and automatic batch control systems for two other asphalt plants, all in New York State. The four contracts, prepared by the sell-

---

[1]. N.Y.U.C.C. 2–102 (McKinney's 1964); Ohio Rev.Code 1302.02. The "UCC" was adopted in New York in 1962, effective September 27, 1964 (N.Y.U.C.C. 10–105; in Ohio, in 1961, effective July 1, 1962 (Ohio 129 v. Senate Bill 5, eff. 7–1–62, §§ 2, 3).

[2]. Each contract contains the erroneous factual assertion, "This contract was made in Solon, Ohio."

er, defendant herein, all contained a standardized page entitled "General Terms and Conditions," which purported to limit defendant's warranties and plaintiff's remedies for breaches of warranty or contract. Plaintiff's payments were to be made periodically, according to the progress of defendant's performance, and title was to remain in defendant until the price had been paid in full.

Plaintiff made partial payment, and then instituted suit on December 24, 1965, seeking damages for breach of contract, breach of warranty, and negligence, and also specific performance of the contracts. Plaintiff also sought its disbursements under an asserted oral contract in providing labor, equipment, and material to assist defendant in defendant's erection of the plants.

Defendant counterclaimed for the amount due under the contracts, which the parties have stipulated to be $385,-229.25, plus interest. Defendant also claimed that the making and filing of a financing agreement pledging the plants and certain other equipment to the Irving Trust Company as security for loans aggregating $600,000 plus interest, amounted to a conversion. Defendant claimed an alternative right to the $385,-229.25 as damages under this theory, plus $700,000 punitive damages. Defendant also claimed that the replacement of certain parts of the plants by plaintiff worked a *pro tanto* conversion. Other counterclaims sought the rental value for plaintiff's use of an old plant that was to have been traded in as part of the purchase price of the new plants, under a theory of quasi-contract, and an accounting by plaintiff of profits from its use of the two plants.

The case was tried to a jury and the undersigned for nineteen days. At trial, it was ruled that the plaintiff could not prove alleged lost profits.[3] The action for specific performance of the contract was abandoned. Defendant was granted a directed verdict, with plaintiff's acquiescence, as to the automatic batch control contracts (a minor part of the entire case). Otherwise, all issues survived for jury consideration.

The issues were presented to the jury in the form of a general verdict with written interrogatories, pursuant to Rule 49(b), F.R.Civ.P.[4] The proposed interrogatories were submitted to counsel for their comments well in advance of their summations. Each side proposed minor changes and additions, which were made. The jury was then charged on the several issues.

The jury found that the defendant had substantially performed the contracts, and that the plaintiff owed a net amount of $226,000, after deduction of $160,000 for expenses of plaintiff, from the approximately $386,000 unpaid balance owing defendant.

The jury also found that the defendant had failed to provide the remedy of repair and replacement of defective or nonconforming parts, which the contracts stated was to be the exclusive remedy. This finding obviated the necessity for consideration of any "failure of essential purpose" under the Uniform Commercial Code, Section 2-719(2).[5]

The jury further found that neither party had been negligent. It found that there had been a conversion; it also found, however, that no damages flowed therefrom. And it found that the plaintiff was not liable for any rent.

Both parties have moved to amend the judgment which was entered for the defendant, The Lewis Welding and Engineering Corporation, in the amount of $226,000. Plaintiff has so moved because

---

3. The ruling, during trial, on this issue is appended to this memorandum. Appendix B.

4. See trial transcript, at 2627–2629, 2820, 2998, colloquy at 3020 et seq. The interrogatories, with answers by the jury, are attached to this memorandum as Appendix A.

5. Ohio Rev.Code 1302.93(B). See Appendix B.

of a different interpretation of the jury's findings. The above discussion makes evident the undersigned's conclusion that the general verdict and the replies to the written interrogatories are entirely consistent and harmonious. Any other interpretation of the replies to the interrogatories would render them inconsistent both with the general verdict and with each other.

Defendant has moved to have the judgment amended to include an award of pre-judgment interest in its favor. Pre-judgment interest is a part of the entire recovery; along with such limitations of remedy as exclusion of consequential damages, it is one aspect of the general issue of the measure of recovery for breaches of contract. St. Clair v. Eastern Air Lines, Inc., 302 F.2d 477 (2d Cir. 1962); Restatement (second) Conflict of Laws (Proposed Official Draft, 1968) § 207, Comment e; *but cf.* Kilberg v. Northeast Airlines, 9 N.Y.2d 34, 211 N.Y.S.2d 133, 172 N.E.2d 526 (1961).

■ Defendant has asserted that New York law governs the interest issue, while plaintiff argues for Ohio law. The appropriate standard for determination of a choice of law issue in a diversity case is the conflicts of law rules of the forum state (New York). The revelant rule, contained within the New York U.C.C., provides:

"§ 1–105 *Territorial Application of the Act; Parties' Power to Choose Applicable Law.*

"(1) * * * When a *transaction* bears a *reasonable relation* to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement this Act applies to transactions

bearing an *appropriate* relation to this state [emphasis supplied]." [6]

The parties to this suit in each of their contracts here in issue agreed as follows:

"GOVERNING LAW: The validity, interpretation, and performance of this contract shall be governed by the laws of Ohio." [7]

Therefore, if it be assumed that New York is "appropriately related" to the transactions herein involved, the question becomes whether Ohio is "reasonably related" to the "transaction." The answer is that it is; while most of the performance of the contracts was to occur in New York, significant events were to occur in Ohio. Certain parts for the equipment sold by defendant were to have been fabricated or shipped from defendant's plant located in Ohio. And the contracts provided plaintiff an exclusive remedy of repair or replacement of parts " * * * shipped to the Company * * * " [8]

■ It appears quite reasonable for the defendant to have required that its performance be regulated by the legal system with which it was presumably most familiar, in light of the probability of a substantial part of its performance's occurring in Ohio. Therefore, Ohio law will be applied to all issues concerning remedies for contractual breaches. [9]

Ohio law provides no explicit statutory guidelines [10] comparable to New York's C.P.L.R. 5001 [11] for determining situations in which pre-judgment interest should be awarded. The decision appears to be left to the court's discretion, guided only by general equitable principles. Young v. Potts, 161 F.2d 597, 600 (6th Cir. 1947); Crown Industries, Inc. v. Boyertown Burial Casket Company, 300 F.2d 809, 810, dissent at 812 (6th Cir. 1962); *cf.* Miller v. Robertson, 266 U.S.

---

6. N.Y.U.C.C. 1–105(1).

7. Page in all the contracts entitled, "General Terms and Conditions."

8. Ibid.

9. See also last paragraph of Appendix B.

10. See Ohio Rev.Code chapter 1343.

11. McKinney's, 1963.

243, 257–258, 45 S.Ct. 73, 69 L.Ed. 265.[12]

There are factors in this case militating both for and against an award of interest. In its favor, there is a policy of commercial situations that "remedies * * * shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." [13] Commercial contexts would normally require inclusion of interest on a payment adjudged unjustifiably withheld.[14]

The major factor supporting plaintiff's opposition to the imposition of interest is the uncertainty of the debt. That the unpaid purchase price was owing was never questioned, but the merit of plaintiff's asserted offsets [15] was incalculable until trial. One offset, a claim for expenses incurred in the performance by plaintiff of an oral contract, was eventually allowed in the amount of $160,000. Another offset, for consequential damages in the nature of lost profits, survived defendant's attempt at pre-trial disposition, to be disallowed at trial.[16]

■ On balance, with regard to the contracts for the sale of the asphalt plants, with regard to the nature of this case and to the jury's findings, this court determines that an allowance of interest is necessary in order for the defendant to receive adequate compensation for its injury. Testimony at trial indicated that the plaintiff has been receiving interest on what has now been determined to have been defendant's money since 1965. Accordingly, interest at the rate of 6 percent will be assessed on the $194,229.-43 portion of the $226,000.00 recovery allocable to the asphalt plant contracts.[17] Since the unpaid balance on the Tarrytown plant was due on July 1, 1965, and on the West Nyack plant on September 16, 1965,[18] interest will run from the intermediate date of August 8, 1965, through November 9, 1970, the date judgment was entered.

With regard to the two automatic batch control system contracts, no evidence was adduced to counter the contention that the entire price became payable upon New York State approval of the systems, and so an unopposed directed verdict was granted on this issue. Therefore, interest at 6 percent will be assessed, on the $14,403.76 due on the Hancock, New York system, to run from September 1, 1965, and on the $17,366.81 due on the Walton, New York system, to run from November 1, 1965, both through November 9, 1970.

In conclusion, the judgment entered upon the general verdict will be amended to include an additional amount of interest at the rate of 6 percent and from

---

12. Federal Surety Co. v. A. Bentley & Sons Co., 51 F.2d 24 (6th Cir. 1931), cited by both parties herein, is best understood as a case applying the "federal rule" in a pre-Erie R. R. v. Tompkins context.

13. U.C.C. 1–106; Ohio Rev.Code 1301.06.

14. Royal Indemnity Co. v. United States, 313 U.S. 289, 296, 61 S.Ct. 995, 85 L.Ed. 1361 (1941). The facts of this case involved default upon a contractual obligation owed the United States.

15. U.C.C. 2–714; Ohio Rev.Code 1302.88.

16. Defendant's motion for summary judgment on the issue of consequential damages was denied by Judge Frankel of this court on June 2, 1968. *See also* Appendix B.

17. This is the maximum Ohio rate; Ohio Rev.Code 1343.03.

18. See the payment terms of the contracts; page 18 in those signed December 22, 1964. These pages set payment dates and amounts. *See also* Pre-Trial Order; trial testimony.

the dates indicated above. All motions on which decisions were reserved at trial, for judgment *non obstante veredicto*, and for a new trial, as heretofore indicated, are denied.

So ordered.

## APPENDIX A

PLEASE READ ALL QUESTIONS BEFORE PROCEEDING TO ANSWER ANY OF THEM

GENERAL VERDICTS WITH SPECIAL INTERROGATORIES

I—*Questions in the nature of a general verdict.*

1.  Is the plaintiff (COUNTY ASPHALT) indebted to the defendant (LEWIS WELDING) for any amount not offset by the total of backcharges and damages, if any, found by you in your answers to the special interrogatories below?

    ANSWER (yes or no)    <u>Yes</u>

1a. If your answer to Question No. 1 is "yes," state the amount in dollars.    $226,000

2.  If the answer to Question No. 1 is "No," is the defendant (LEWIS WELDING) indebted to the plaintiff (COUNTY ASPHALT) for any amount the latter expended over and above the unpaid balance of the purchase price?

    ANSWER (yes or no)    <u>      </u>

2.a. If your answer to No. 2 is "yes," state the amount in dollars.    $<u>    </u>

II—*Special Interrogatories.*

1.  Was there substantial performance on the part of defendant (LEWIS WELDING) of the contracts entered into with plaintiff (COUNTY ASPHALT) on December 22, 1964?

    ANSWER (yes or no)    <u>Yes</u>

2.  Is there a balance due defendant (LEWIS WELDING) from the total purchase price of the plants sold and erected at Tarrytown and West Nyack?

    ANSWER (yes or no)    <u>Yes</u>

2a. If your answer to Question No. 2 is "No," proceed to Question No. 3. If "Yes," what is the amount of the balance due the defendant?

    ANSWER (a dollar amount)    $226,000

3.  Was there a supplemental agreement entered into by the parties wherein the plaintiff (COUNTY ASPHALT) agreed to supply labor, materials, and equipment as needed by the defendant (LEWIS WELDING) in the erection of the plants, and to pay for said labor, material, and equipment, with the defendant agreeing to repay the plaintiff on being "backcharged" by it?

    ANSWER (yes or no)    <u>Yes</u>

3a. If your answer to Question No. 3 is "No," disregard this question and proceed to Question No. 4. If your answer is "Yes," what was the reasonable amount that the plaintiff (COUNTY ASPHALT) should have backcharged the defendant (LEWIS WELDING) for moneys expended by it in payment for employees, materials, or equipment?

ANSWER (a dollar amount)     $160,000

4. The contracts in suit state:

" * * * The Company will repair or, at its option, replace any part or parts of the equipment which upon examination are determined to be defective or non-conforming under the Company's Warranty and in respect of which the Company was notified in writing, as hereinabove provided, within the warranty period. Such part or parts should, upon notification from the Company, be shipped to the Company, f. o. b. the Company's plant, for its examination."

Did the plaintiff (COUNTY ASPHALT) comply with these provisions by:

    i. Giving notice to defendant (LEWIS WELDING)?

ANSWER (yes or no)     Yes

    ii. Shipping as requested?

ANSWER (yes or no)     Yes

    iii. Allowing the defendant (LEWIS WELDING) reasonable access to the plants for purposes of repair or replacement?

ANSWER (yes or no)     Yes

4a. Did the defendant (LEWIS WELDING) comply with these provisions by repairing or replacing every defective or non-conforming part of which it was made aware and given opportunity?

ANSWER (yes or no)     No

5. Was the performance by the defendant (LEWIS WELDING) negligent, as that term has been defined to you in the discharge of its contractual duties?

ANSWER (yes or no)     No

5a. If your answer is "No," proceed to Question No. 6. If "Yes," what is the total diminution in value by reason of defendant's (LEWIS WELDING) negligence in the discharge of its contractual duties which is not included in the amounts, if any, stated in your earlier answers?

ANSWER (a dollar amount)     ———

6. Did the plaintiff (COUNTY ASPHALT) operate and maintain the plants and equipment which are the subjects of the contracts in suit in a proper manner?

ANSWER (yes or no)     Yes

6a. If your answer is "yes," proceed to Question No. 7. If "no," what damages, if any, included in the amounts fixed by you in your earlier answers were caused by plaintiff (COUNTY ASPHALT'S) failure to properly operate or maintain?

ANSWER (a dollar amount) _____

6b. If your answer to Question No. 6 was "No," please look at your answer to Question No. 5. If your answer to that question was "Yes," then answer this question. Otherwise, proceed to Question No. 7. (QUESTION) Were any of the damages listed in your answer to Question No. 5 proximately caused, as that term has been defined to you, by plaintiff's (COUNTY ASPHALT) failure to operate or maintain the plants or equipment?

ANSWER (yes or no) _____

7. Did plaintiff (COUNTY ASPHALT) "convert" the plants, as the term "convert" or "conversion" has been defined to you?

ANSWER (yes or no) __Yes__

7a. If your answer to Question No. 7 was "yes," what damages, if any, were caused defendant (LEWIS WELDING) by plaintiff (COUNTY ASPHALT'S) conversion which were not listed in your answers to any of the above questions?

ANSWER (yes or no) __No__

7b. If your answer to Question No. 7 was "yes," did plaintiff (COUNTY ASPHALT) "convert" the plants in a manner that was willful, malicious and in wanton disregard of the rights of defendant (LEWIS WELDING)?

ANSWER (yes or no) __No__

7c. If your answer to Question No. 7b was "yes" and you believe that punitive damages, as that term has been defined to you, should be assessed against plaintiff (COUNTY ASPHALT), in what amount should such damages be so assessed? If you do not award a dollar amount in answer to Question No. 7a, you must not award a dollar amount here.

ANSWER (a dollar amount) _____

8. Is the plaintiff (COUNTY ASPHALT) liable for the reasonable rental value in the West Nyack, N. Y. area for five months in the summer of 1965 for a used 1949 Cummer 2-Ton Asphalt Plant?

ANSWER (yes or no) __No__

8a. If your answer to Question No. 8 was "yes," what is the reasonable rental value for which the plaintiff is liable?

ANSWER (a dollar amount) _____

## APPENDIX B

### RULING ON THE ENFORCEABILITY OF EXCLUSIONS OF CONSEQUENTIAL DAMAGES IN TWO OF THE CONTRACTS IN SUIT.

█ The contracts involved in this action purport to exclude consequential damages for seller's breaches. Plaintiff has asserted that these exclusions should be denied enforcement because of their "unconscionability."[1] It is the opinion of this Court that a determination of this issue can now be made without recourse to a separate hearing out of the presence of the jury. Such a hearing is not legally required and would at this time prove unnecessary, since all the facts into which it could inquire have already been developed during the extensive trial. Accordingly, the Court now rules that the clauses in question are not unconscionable, for the following reasons:

UCC 2–719[2] expressly permits exclusion of consequential damages unless such exclusion would be unconscionable. It states that "Limitation of damages where the loss is commercial is not [prima facie unconscionable.]" Typical cases where a contract or clauses thereof are "unconscionable" are where one party has been misled as to the nature of the bargain, where there appears to have been a severe imbalance in bargaining power, or where specific terms appear "outrageous."[3] While these situations occur more frequently in non-commercial settings, the existence of a commercial setting is not of itself sufficient insulation against a charge of unconscionability. However, it is the exceptional commercial setting where a claim of unconscionability will be allowed, absent undiscoverable "latent defects." And in this, as most commercial situations, there appear to have been no "incidents of unconscionability," such as have been described above. On the contrary, the evidence presented warrants the following conclusions:

Defendant has evinced enough good faith in the performance of its contractual obligations to allow it to assert the exculpatory clause. Were the defendant guilty of bad faith, it might have been estopped from asserting exculpatory contractual language. Courts and commentators have used such terms as "substantial performance" or performing the "iron essence" of a contract when discussing what minimum is necessary to allow a party to raise these defenses,[4] but the basic idea appears to be akin to "good faith." In this case, while the jury may or may not find that defendant has not performed to the letter of the contracts, the evidence does unquestionably demonstrate that defendant has "substantially performed" for the purposes of this ruling.

Furthermore, the existence of competitors in defendant's industry, and plaintiff's utilization of that fact by procuring alternative contract proposals from defendant's competitors, precludes any argument of unequal bargaining power. There has been no showing that the clauses in question are part of an adhesion form agreed upon by every member of defendant's industry, and even if there had been such a showing, plaintiff would have retained the impressive negotiation power of one prepared to spend approximately one-half million dollars. The continued inclusion of the clauses in the contracts here in issue, in spite of plaintiff's powerful bargaining position, is further support for the inference that they are necessary to the orderly functioning of defendant's industry. Plaintiff could always have nego-

---

1. U.C.C. 2–719, 2–302; Ohio Rev.Code 1302.93, 1302.15.

2. Ohio Rev.Code 1302.93.

3. See generally, Ellinghaus, In Defense of Unconscionability, 78 Yale L.J. 757, 793 et seq., and cases therein cited.

4. See, e. g., Llewellyn, The Common Law Tradition (1960) 362–371, on the subject of what is the "essence" of a transaction of this type.

tiated for a "liquidated damages" clause.[5]

Also, plaintiff's experience and expertise, and the parties' care in negotiating these large contracts, preclude any argument of unfair surprise.

Finally, defendant has provided plaintiff with what will be an adequate substitute remedy. The contracts state:

> * * * the remedy hereinafter provided the Purchasesr shall be exclusive for any breach * * * The company will repair or, at its option, replace any part or parts of the equipment which upon examination are determined to be defective or non-conforming * * *

The Uniform Commercial Code states that this remedy of "repair and replacement" may be designated the buyer's exclusive remedy.[6] But in so designating any remedy as "exclusive," a seller runs the risk that the remedy will "fail of its essential purpose." In such a situation, the buyer will be relegated to all other remedies,[7] in order to preserve for him "at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract."[8]

Plaintiff has alleged various breaches by defendant of the contracts at issue. If any of these breaches are proven to have occurred, the circumstances of the parties then and now will render the exclusive remedy provided wholly inadequate. Therefore, if plaintiff is entitled to any remedy at all, it is entitled to whatever remedies would be available to it "if the * * * clause had never existed."[9] Indeed, to enforce the exclusivity of the "repair and replacement"

remedy in the face of any of the breaches herein asserted would be to create an unconscionable result.

Plaintiff would have UCC 2–719 read in such a fashion as to result in all limitations whatsoever being stricken in any event in which an exclusive remedy should fail of its essential purpose. A better reading is that the exclusive remedy clause should be ignored; other clauses limiting remedies in less drastic manners and on different theories would be left to stand or fall independently of the stricken clause. Since the clause excluding consequential damages has been held not unconscionable, and is not otherwise offensive, it will be applied. Therefore, plaintiff will still be allowed to obtain incidental damages, including "commercially reasonable charges, expenses, or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach,"[10] but excluding consequential damages.

Since other exculpatory clauses in the contracts have not been challenged as unconscionable, their validity in that respect is not in dispute. But the above-stated reasoning would appear to be applicable in any such challenge.

This ruling shall not affect plaintiff's rights, if any, under the asserted backcharge agreement.

The Uniform Commercial Code as adopted and construed by the State of Ohio governs this issue. However, the result would have been identical had the Code as adopted and construed by New York been found applicable.

5. See U.C.C. 2–718; Ohio Rev.Code 1302.92.

6. U.C.C. 2–719(1) (a); Ohio Rev.Code 1302.73(A) (1).

7. U.C.C. 2–719(2); Ohio Rev.Code 1302.93 (B).

8. U.C.C. 2–719, Official Comment (1).

9. *Ibid.*

10. U.C.C. 2–715; Ohio Rev.Code 1302.89.