**McNALLY WELLMAN COMPANY, A DIVISION OF BOLIDEN ALLIS, INC., Plaintiff–Counter–Defendant–Appellee,**

v.

**NEW YORK STATE ELECTRIC & GAS CORPORATION, Defendant–Counter–Claimant–Appellant.**

No. 1650.

Docket 94–9273.

United States Court of Appeals,
Second Circuit.

Argued May 31, 1995.

Decided Aug. 18, 1995.

Michael Guararra, New York City (Huber Lawrence & Abell, of counsel), for defendant-counter-claimant-appellant.

John R. Dingess, Pittsburgh, PA (Kirkpatrick & Lockhart, of counsel), for plaintiff-counter-defendant-appellee.

Before: MESKILL, McLAUGHLIN and LAY,* Circuit Judges.

MESKILL, Circuit Judge:

This case requires us to construe a contract clause excluding incidental and consequential damages under New York law. McNally Wellman Company, a division of Boliden Allis, Inc. (McNally), brought this diversity action to recover on a construction contract between its predecessor, Dravo Cor-

poration,[1] and New York State Electric & Gas Company (NYSEG), for the sale of six spillway gates and other equipment for a dam project. NYSEG filed counterclaims seeking recovery of the costs it incurred from McNally's delay in delivering the gates. The United States District Court for the Northern District of New York, Munson, J., found that the terms of the contract, as interpreted under New York's Uniform Commercial Code (UCC), prevented NYSEG from recovering on its counterclaims, and entered summary judgment in McNally's favor. We affirm.

## BACKGROUND

NYSEG's Upper Mechanicville Spillway Project involved the refurbishment of a dam in Upper Mechanicville, New York. NYSEG hired McNally to supply the six spillway gates for the dam, together with other embedded parts and a hydraulic operating system, and the two parties signed a written contract memorializing their agreement on June 17, 1988. The contract provided that McNally would deliver the first pair of gates by November 28, 1988, the second pair by June 3, 1989, and the third pair by September 1, 1989. Performance by the last of these dates was considered necessary to ensure completion of the entire project by May 20, 1990, the termination date of NYSEG's construction permit with the Federal Energy Regulatory Commission (FERC). McNally received progress payments under the contract following the delivery of each of the gates, which were 111 feet long and weighed approximately 500,000 pounds. McNally took no responsibility for on-site assembly or installation or any future maintenance of the gates. NYSEG, for its part, conducted an independent evaluation of Ellwood City Iron & Wire Company (Ellwood), McNally's choice of subcontractor responsible for the fabrication of the gates, and explicitly approved McNally's choice.

* Honorable Donald P. Lay, United States Circuit Judge for the Eighth Circuit, sitting by designation.

1. Dravo Corporation originally entered into the contract with NYSEG through its unincorporated division, Dravo Wellman Company. Boliden Al-

lis, Inc., through a division named McNally Wellman Company, a Delaware corporation, is the successor-in-interest of the Dravo Corporation. For the sake of simplicity we refer to McNally as the party to the contract.

McNally's selection of Ellwood proved unfortunate, for the subcontractor experienced financial and labor difficulties that ultimately delayed delivery of the gates. McNally's project manager, Robert Rice, first informed NYSEG that Ellwood would be unable to meet the original delivery schedule on January 18, 1989. The parties then agreed to two revisions to the delivery schedule. NYSEG's project manager, Richard Potts, consented to the revisions, realizing that if delivery was made under the original schedule NYSEG would have to store the gates for several months until the project was ready for their installation. Under the second revision the delivery of all gates was to be completed by September 18, 1989, and Potts informed Rice that this final delivery date was the latest acceptable to avoid a delay in the overall project.

Although McNally in turn informed Ellwood of the revised delivery dates, Ellwood failed to produce the gates as scheduled. On March 29, 1989 Ellwood, experiencing cash-flow problems, threatened to take workers off the gates unless McNally made a substantial progress payment, even though Ellwood's contract required McNally to make payments only on shipment of each gate. McNally eventually yielded to Ellwood's demand, agreeing on April 14 to pre-pay $74,000 in return for a security interest in the gates and Ellwood's promise not to remove workers from the job. NYSEG meanwhile became increasingly concerned with Ellwood's productivity, and on April 24, 1989 NYSEG invoked paragraph 90.2 of McNally's contract to require McNally to furnish 24-hour labor to put the work back on schedule. Paragraph 90.2 states in pertinent part:

> If progress of the Work is such that in the opinion of Engineer its completion within the Contract time appears improbable, due allowance having been made for extensions of time as set forth above, Contractor, if Engineer so directs, shall proceed with the work day and night, Sundays and Holidays, furnishing a full force of men and foremen for all overtime work until work is back on schedule, and in such case, Contractor shall have no claim for extra costs, expenses or changes thereby occasioned.

Because the subcontract between McNally and Ellwood did not contain a provision similar to paragraph 90.2, however, McNally was unable to force Ellwood to undertake production on a 24-hour basis. Ellwood subsequently made another demand for an advance payment from McNally, and kept its workers off the job for several weeks until this second dispute was resolved.

These delays forced NYSEG and McNally to revise the delivery schedule on two subsequent occasions, each anticipating delivery of the final gate in September 1989. When representatives of NYSEG, McNally and Ellwood met to assess progress on August 30, after delivery of only four gates, Ellwood's representative stated that his company was being liquidated in early October but intended to deliver the last two gates by September 12. This prediction also proved unrealistic, and McNally subsequently terminated its contract with Ellwood. This decision forced McNally to bring a replevin action to obtain possession of gates five and six from Ellwood, and to hire another company, Western Pennsylvania Steel Fabrication, to complete the gates. As a result, NYSEG did not receive the fifth gate until December 26, 1989 and the sixth gate until February 2, 1990.[2]

2. The revisions to the schedule occurred as follows:

| Gate No. | Original Contract | 2–07–89 Revision | 3–17–89 Revision | 6–27–89 Revision | 8–30–89 Revision | Final Delivery |
|---|---|---|---|---|---|---|
| 1 | 1–07–89 | 2–20–89 | 4–17–89 | | | 5–16–89 |
| 2 | 1–07–89 | 4–03–89 | 5–08–89 | | | 6–02–89 |
| 3 | 6–03–89 | 5–15–89 | 5–29–89 | 7–07–89 | | 7–26–89 |
| 4 | 6–03–89 | 6–26–89 | 6–18–89 | 7–28–89 | | 8–24–89 |
| 5 | 9–01–89 | 8–07–89 | 7–09–89 | 8–18–89 | 9–12–89 | 12–26–89 |
| 6 | 9–01–89 | 9–18–89 | 7–30–89 | 9–09–89 | 9–12–89 | 2–02–90 |

The third revision (June 27) is more accurately characterized as a counterproposal by McNally to a revision proposed by NYSEG on June 21, 1989. It is unclear from the record whether

NYSEG claims the delay in delivery of each of the gates caused it to incur costs, most significantly the expense of maintaining the subcontractor responsible for the gates' installations at the project during the winter months. Importantly, however, the delays did not prevent NYSEG from completing the project prior to the termination date on its FERC construction permit or force it to incur additional costs (other than the installation subcontractor's standby costs) to meet that deadline, and NYSEG further concedes that all six gates were manufactured as warranted under McNally's contract.

Thereafter, NYSEG refused to make its final payment to McNally, contending that the delivery delays constituted a breach of their contract, and further assessed to McNally the standby costs incurred by the installation subcontractor. In response McNally invoked paragraph 360 of the contract. This special provision, added as an addendum by McNally and amended and approved by NYSEG, reads in pertinent part:

> In no event and not withstanding [sic] any other provision of this Contract shall Contractor be liable for any special, incidental, indirect, or consequential damages, or for any damages of a similar nature arising out of or in connection with this Contract, ... regardless of whether any such liability shall be claimed in contract, equity, tort (including negligence) or otherwise. By way of example of the foregoing limitation of liability, but without limiting in any manner its scope or application, Contractor shall not be liable for all or any part of any of the following, no matter how claimed ...: loss of profit or revenue, ... cost of capital, ... loss or reduction of use or value of any facilities ... or increased costs of operations or maintenance. The limitation of liability contained in this Article shall be effective without regard to Contractor's performance or failure or delay of performance under any other term or condition of this Contract, including those contained in any warranty article.

> In any case where Contractor is supplying only design and components and is not responsible for erection of the equipment, NYSEG specifically consented to the June 27

all costs related to the assembly and erection of the equipment in the field shall be deemed special, indirect, incidental or consequential and shall in no case be the responsibility of Contractor. This clause is not intended to supercede [sic] the rights of Owner [NYSEG] to require the Contractor to bear all costs and expenses of corrective work under the warranty.

Unable to reach an agreement on payment McNally filed this diversity action for $469,-416.40 plus interest under theories of breach of contract and *quantum meruit*. NYSEG counterclaimed, seeking $872,793.09 as damages for the costs it allegedly incurred as a result of McNally's delays.

The case followed a somewhat tortuous path during which the district court addressed the various legal issues now also raised in this appeal. In sum, the district court first found that paragraph 360 exonerated McNally from liability for NYSEG's delay costs, but directed discovery on the issue of whether any of the common law exceptions to "no-damage-for-delay" clauses, as set forth in *Corinno Civetta Constr. Corp. v. City of New York*, 67 N.Y.2d 297, 502 N.Y.S.2d 681, 493 N.E.2d 905 (1986), rendered paragraph 360 unenforceable. After the conclusion of this additional discovery NYSEG amended its counterclaims to assert that McNally breached a fundamental obligation under the contract and acted in bad faith. The district court then rejected these common-law claims by concluding that because the contract involved the sale of goods, it was governed by Article 2 of the UCC and not the common law, and further determined that paragraph 360 was enforceable under the UCC. Reaffirming its earlier finding, the district court also concluded that NYSEG's damages related entirely to delay and thus were excluded. Finally, the district court determined that NYSEG breached the contract by refusing to pay McNally the amount remaining under the contract, and entered judgment in McNally's favor. NYSEG now appeals.

## DISCUSSION

NYSEG claims that McNally breached the contract by delivering the gates after the revision.

revised dates[3] and by failing to make all necessary efforts to speed production and prevent such delays. McNally counters that although its performance was delayed, in all other respects it performed as warranted. McNally thus argues that in agreeing to paragraph 360 NYSEG waived its right to any claim for damages due solely to the delayed delivery of the gates.

▪ Neither party contests the district court's decision that Article 2 of New York's UCC governs our review of the contract.[4] McNally agreed to supply the six gates as well as other associated parts and equipment necessary for their operation, and the parties' contract explicitly excluded any services related to their installation or ongoing maintenance. The essential terms and consequences of the contract thus predominantly concerned the sale of goods, and the UCC therefore governs the parties' claims. *See Levin v. Hoffman Fuel Co.*, 94 A.D.2d 640, 462 N.Y.S.2d 195, 196 (1st Dep't), *aff'd*, 60 N.Y.2d 665, 468 N.Y.S.2d 104, 455 N.E.2d 663 (1983); *cf. Forward Indus. v. Rolm of New York Corp.*, 123 A.D.2d 374, 506 N.Y.S.2d 453, 454–55 (2d Dep't 1986) (applying common law to contract for sale of telephone equipment as contract predominantly consisted of installation and maintenance services).

▪ The parties' claims raise four interrelated issues: (1) whether NYSEG's damages are direct, and thus recoverable, or whether they are either indirect or conse-

quential, and thus subject to paragraph 360 of the contract, (2) whether section 2–719 of the UCC[5] supplants the common-law exceptions to no-damage-for-delay provisions outlined by the New York Court of Appeals in *Corinno Civetta*, (3) whether subsections (2) and (3) of section 2–719 are interdependent—permitting recovery of consequential damages despite a disclaimer when a limited remedy fails of its essential purpose, or independent—allowing an exclusion of consequential damages to survive, even if a limited remedy fails of its essential purpose, provided the limitation of damages is not unconscionable under section 2–719(3), and (4) even if the UCC here supplants the common law, whether paragraph 360's exclusion of incidental and consequential damages remains enforceable if McNally acted in bad faith. We review the district court's resolution of these issues *de novo*, *see American Casualty Co. of Reading, Pa. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir.1994), and will reverse only if there exists a genuine issue for trial. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). We need not affirm for the reasons expressed by the district court but may affirm on any ground supported by the record. *Revak v. SEC Realty Corp.*, 18 F.3d 81, 83 (2d Cir.1994).

## I

▪ This appeal would merit a quick reversal were we to determine that the dam-

---

3. We note that the parties' several agreements postponing delivery beyond the original contract dates formed enforceable modifications of their original contract. *See* N.Y. U.C.C. § 2–209(1) (McKinney 1993).

4. There also is no dispute that New York law generally governs this diversity action, as paragraph 310.1 of the parties' contract specifies that its provisions "shall be interpreted according to the laws of the State of New York."

5. Section 2–719 provides as follows:
 (1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,
 (a) the agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable

under this Article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and
 (b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.
(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act.
(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.
N.Y. U.C.C. § 2–719 (McKinney 1993).

ages NYSEG incurred as a result of McNally's delays were direct, rather than indirect or consequential, as paragraph 360 does not preclude the recovery of direct damages. NYSEG's counterclaims asserted two categories of damages arising from late delivery of the gates: the standby costs assessed by the installation subcontractor and its own additional financing costs. NYSEG admits that its financing costs constitute consequential damages, but argues that the standby costs constitute direct damages. We conclude, however, that NYSEG's delay damages are categorized as either indirect or consequential by paragraph 360 itself.

It is axiomatic that parties to a contract must remain free to allocate risks and shield themselves from liability. *See* N.Y. U.C.C. § 2–719 cmt. 1 (McKinney 1993) ("Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect."). While ordinarily the precise demarcation between direct damages and incidental or consequential damages is an issue of fact, in this case the parties themselves defined the scope of excluded damages in the contract. Paragraph 360 purports to protect McNally from liability "for any special, incidental, indirect, or consequential damages, or for any damages of a similar nature.... [A]ll costs related to the assembly and erection of the equipment in the field shall be deemed special, indirect, incidental or consequential and shall in no case be the responsibility of [McNally]." Moreover, paragraph 360 specifically contemplates the type of damages asserted by NYSEG here, as it states that the exclusion of liability "shall be effective without regard to [McNally's] performance or failure or *delay* of performance under any other term or condition of this Contract." (emphasis added). The parties had every reason to anticipate that the subcontractor

actually manufacturing the gates could cause a delay in their delivery, and thus chose to define any damages that resulted from such a delay as incidental or consequential in paragraph 360. This definition, moreover, is consistent with the UCC's definition of incidental and consequential damages. *See* N.Y. U.C.C. § 2–715(1) (McKinney 1993) ("Incidental damages resulting from the seller's breach include expenses reasonably incurred in ... care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense *incident to the delay or other breach*.") (emphasis added); N.Y. U.C.C. § 2–715(2) (McKinney 1993) ("Consequential damages resulting from the seller's breach include (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise."); *see also Carbontek Trading Co. v. Phibro Energy,* 910 F.2d 302, 307–08 (5th Cir.1990) (applying New York law) (treating delay damages as incidental, citing UCC § 2–715(1)); *In re Chateaugay Corp.,* 162 B.R. 949, 959 (Bankr.S.D.N.Y.1994) (holding delay damages and labor charges were either consequential or incidental in nature); *Belfont Sales Corp. v. Gruen Indus.,* 112 A.D.2d 96, 491 N.Y.S.2d 652, 655 (1st Dep't 1985) (same).[6] All of NYSEG's delay damages thus fall under paragraph 360, and accordingly we now must determine whether that provision is enforceable under the UCC.

## II

In contesting the enforceability of paragraph 360, NYSEG principally contends that the common law exceptions to "no-damages-for-delay" clauses, as set forth by the New York Court of Appeals in *Corinno Civetta,*

---

6. NYSEG relies on *Mead Corp. v. McNally–Pittsburgh Mfg.,* 654 F.2d 1197 (6th Cir.1981), in support of its argument that expenses incurred due to delay cannot be considered consequential or incidental. In *Mead* the Sixth Circuit, applying Ohio law, held that field escalation costs were direct damages because they were the result of the buyer's acceptance of nonconforming goods. *Id.* at 1208–09. Unlike the buyer in

*Mead,* however, NYSEG expressly agreed to limit its delay damages, and the spillway gates supplied by McNally were not nonconforming but instead met all contractual warranties. Indeed, the parties in *Mead,* when drafting their contract, never resolved the "critical question" of who would bear the risk of consequential damages from delay. *Id. Mead,* in short, is inapposite to this appeal.

also apply to a contract governed by the UCC. McNally, in response, urges us to affirm the district court's finding that the UCC supplants the common law. We agree with the district court.

New York courts have held specifically that the UCC displaces the common law when the particular section at issue produces a result that would be contrary to that obtained under ordinary contract law. *See Horn Waterproofing Corp. v. Bushwick Iron & Steel Co.*, 66 N.Y.2d 321, 497 N.Y.S.2d 310, 314, 488 N.E.2d 56, 60 (1985) (holding UCC supplants common law where specific provision "is sufficiently extensive to alter" the common law); *AP Propane v. Sperbeck*, 157 A.D.2d 27, 555 N.Y.S.2d 211, 212 (3d Dep't 1990), *aff'd*, 77 N.Y.2d 886, 568 N.Y.S.2d 908, 571 N.E.2d 78 (1991). Limitations on incidental and consequential damages are governed by section 2–719 of the UCC, and this provision must be compared with the exceptions to "no-damages-for-delay" clauses set forth by the New York Court of Appeals in *Corinno Civetta.*

In *Corinno Civetta* the New York Court of Appeals held that "even exculpatory language which purports to exclude damages for *all* delays resulting from *any* cause whatsoever are not read literally." *Corinno Civetta*, 67 N.Y.2d 297, 502 N.Y.S.2d at 686, 493 N.E.2d at 910 (citation omitted). The *Corinno Civetta* court noted that under the common law, contractual limitations on delay damages will not preclude recovery for delays resulting from bad faith or willful, malicious or grossly negligent conduct, uncontemplated delays, delays constituting an intentional abandonment of the contract, or delays caused by a breach of a fundamental obligation under the contract. *Id. Corinno Civetta* concerned a contract for construction services governed by the common law, however, *see id.*, 67 N.Y.2d 297, 502 N.Y.S.2d at 684, 493 N.E.2d at 908, and not a sales contract governed by the UCC.

■ Section 2–719(3) of the UCC, which governs exclusions of consequential damages, directs the enforcement of such clauses unless they are unconscionable, and the provision contains no other explicit exceptions.

*See Cayuga Harvester v. Allis–Chalmers Corp.*, 95 A.D.2d 5, 465 N.Y.S.2d 606, 614 (4th Dep't 1983); *Belfont Sales Corp.*, 112 A.D:2d 96, 491 N.Y.S.2d at 655; *see also* N.Y. U.C.C. § 2–719(3) cmt. 3 (McKinney 1993) ("Subsection (3) recognizes the validity of clauses limiting or excluding consequential damages but makes it clear that they may not operate in an unconscionable manner."). While we discuss below the question whether a damage exclusion under section 2–719(3) still can be invalid on proof that a seller acted in bad faith or breached a fundamental obligation under the contract, we note here that section 2–719(3) excludes the other exceptions available under the common law. Since section 2–719 thus produces a result that would be inconsistent with the result under *Corinno Civetta*, we find that section 2–719 displaces the common law. *See Horn Waterproofing*, 66 N.Y.2d 321, 497 N.Y.S.2d at 314–15, 488 N.E.2d at 60–61; *AP Propane*, 157 A.D.2d 27, 555 N.Y.S.2d at 212; *see also American Tel. & Tel. Co. v. New York City Human Resources Admin.*, 833 F.Supp. 962, 987–90 (S.D.N.Y.1993) (applying § 2–719 of UCC to clause excluding delay damages in sales contract); *County Asphalt v. Lewis Welding & Eng'g Corp.*, 323 F.Supp. 1300, 1309 (S.D.N.Y.1970) (same), *aff'd*, 444 F.2d 372 (2d Cir.), *cert. denied*, 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971); *Cayuga Harvester*, 95 A.D.2d 5, 465 N.Y.S.2d at 609 (same); *Granite Worsted Mills v. Aaronson Cowen, Ltd.*, 29 A.D.2d 303, 287 N.Y.S.2d 765, 769 (1st Dep't 1968) (same), *rev'd on other grounds*, 25 N.Y.2d 451, 306 N.Y.S.2d 934, 255 N.E.2d 168 (1969). We therefore conclude that section 2–719 governs our interpretation of paragraph 360.

### III

■ Our next inquiry is whether section 2–719 requires the enforcement of paragraph 360. NYSEG argues that incidental and consequential damages are available automatically, notwithstanding a contractual provision excluding such damages under section 2–719(3), if that provision "fails in its purpose" as an exclusive remedy under section 2–

719(2).[7] NYSEG asserts that to hold otherwise would leave it without a "fair quantum of remedy" for damages it incurred due to the delays in the delivery of the gates. McNally contends, in response, that subsections (2) and (3) of section 2–719 operate independently, and that therefore even if paragraph 360 fails under subsection (2) its exclusion of incidental and consequential damages remains enforceable under subsection (3).

NYSEG relies on Official Comment 1 to section 2–719, which states in pertinent part:

> [I]t is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed. Similarly, under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.

N.Y. U.C.C. § 2–719 cmt. 1 (McKinney 1993). NYSEG misapplies this commentary, however, because it cannot be said that NYSEG was deprived of the "substantial value of the bargain." NYSEG received exactly that for which it originally contracted: six spillway gates manufactured according to specification which perform as warranted, delivered within the time frame for completion of the project as a whole. Nor does paragraph 360 "fail in its purpose," as it operated exactly as the parties intended, namely, transferring the risk of any delay in the delivery of the gates to NYSEG.

■ More fundamentally, NYSEG's position ignores the distinction between exclusive remedy provisions, which fall under section 2–719(2), and exclusions of incidental or consequential damages, which are governed under section 2–719(3). There exists a split of authority on whether subsections (2) and (3) operate independently or whether the failure of an exclusive remedy precludes enforcement of a consequential damages exclusion. *Compare Murray v. Holiday Rambler*, 83 Wis.2d 406, 265 N.W.2d 513, 526 (1978) (permitting recovery of consequential damages, despite disclaimer, on exclusive remedy's failure of essential purpose); *Givan v. Mack Truck*, 569 S.W.2d 243, 247 (Mo.Ct.App.1978) (same), *with Chatlos Sys. v. National Cash Register Corp.*, 635 F.2d 1081, 1086–87 (3d Cir.1980) (holding disclaimer of consequential damages is enforceable even if exclusive remedy failed of its essential purpose); *Canal Elec. Co. v. Westinghouse Elec. Corp.*, 406 Mass. 369, 548 N.E.2d 182, 185 (1990); *Envirotech Corp. v. Halco Eng'g*, 234 Va. 583, 364 S.E.2d 215, 219–20 (1988) (same). Under New York law, however, it is well established that the failure of a limited remedy does not render ineffective all other limitations of liability. Rather, a limitation on incidental or consequential damages remains valid even if an exclusive remedy fails. *See, e.g., Computerized Radiological Servs. v. Syntex Corp.*, 595 F.Supp. 1495, 1510 (E.D.N.Y.1984) (" '[A] better reading [of § 2–719] is that the exclusive remedy clause should be ignored; other clauses limiting remedies in less drastic manners and on different theories would be left to stand or fall independently of the stricken clause.' ") (quoting *County Asphalt*, 323 F.Supp. at 1309), *aff'd in relevant part and rev'd in part*, 786 F.2d 72 (2d Cir.1986); *American Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F.Supp. 435, 458 (S.D.N.Y. 1976) (precluding recovery of consequential damages under § 2–719(3) even if party were to prove at trial that exclusive remedy failed); *Belfont Sales Corp.*, 112 A.D.2d 96, 491 N.Y.S.2d at 655 (applying § 2–719(3) and dismissing claims for damages due to "un-

---

7. NYSEG fails to specify how paragraph 360 functions as the parties' exclusive remedy, given that the warranty provision of the contract, contained in paragraph 220, requires McNally to "correct all defects or inadequacies within the terms of this warranty at its own expense" and further states that NYSEG's remedies are not limited by this requirement.

timely delivery" of goods); *Cayuga Harvester*, 95 A.D.2d 5, 465 N.Y.S.2d at 614–15 (holding under § 2–719 that failure of limited remedy does not invalidate consequential damages exclusion).

 Section 2–719(3) states that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable," N.Y. U.C.C. § 2–719(3) (McKinney 1993),[8] and the determination of unconscionability is a question of law. *See Wilson Trading Corp. v. David Ferguson, Ltd.*, 23 N.Y.2d 398, 297 N.Y.S.2d 108, 112, 244 N.E.2d 685, 689 (1968); *Estate of Arena v. Abbott & Cobb*, 158 A.D.2d 926, 551 N.Y.S.2d 715, 716 (4th Dep't), *appeal denied*, 75 N.Y.2d 710, 557 N.Y.S.2d 309, 556 N.E.2d 1116 (1990); N.Y. U.C.C. § 2–302(1). This determination first involves an inquiry into any inequities of bargaining power when the parties drafted the contract, a factor NYSEG cannot argue existed here. *See American Dredging Co. v. Plaza Petroleum*, 799 F.Supp. 1335, 1339 (E.D.N.Y.1992), *vacated in part*, 845 F.Supp. 91 (E.D.N.Y.1993). Further, an assessment of unconscionability "generally requires a showing that the contract was both procedurally and substantively unconscionable when made—*i.e.,* some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 537 N.Y.S.2d 787, 791, 534 N.E.2d 824, 827 (1988) (quotation omitted).

NYSEG concedes that paragraph 360 is not unconscionable, as it possessed a "meaningful choice" when drafting the contract and the provision was negotiated explicitly between the parties, with NYSEG in fact amending the provision to add its final sentence. Further, the exclusion of incidental and consequential damages was not unreasonably favorable to McNally in that it did not disturb the "substantial value of the bargain." N.Y. U.C.C. § 2–719 cmt. 1 (McKinney 1993). In sum, we conclude that paragraph 360's exclusion of incidental and consequential damages is enforceable under section 2–719(3).

## IV

Finally, NYSEG contends that paragraph 360 should not be enforced because McNally performed in bad faith and breached a fundamental obligation under the contract. We review these contentions separately to determine whether NYSEG has established a genuine issue of material fact for trial.

### A. Bad Faith ·

 NYSEG asserts that McNally acted in bad faith by not paying Ellwood to provide 24–hour shifts, as required by paragraph 90.2 of the contract, and by waiting until November 1989 to inform NYSEG that it intended to disclaim liability for delay damages under paragraph 360. To establish this claim NYSEG must establish that these actions constituted an intentional breach of the contract. *See County Asphalt*, 323 F.Supp. at 1309; *see also Kalisch–Jarcho v. City of New York*, 58 N.Y.2d 377, 461 N.Y.S.2d 746, 750–51, 448 N.E.2d 413, 417–18 (1983) (noting under common law that claim of bad faith, regardless of its characterization as "willfulness," "maliciousness," or "gross negligence," must be supported by proof of "deliberate intent" to delay performance).[9]

---

8. Although the terms of § 2–719(3) appear to apply only to consequential damages, courts uniformly apply its unconscionability standard to limitations on incidental damages as well. *See, e.g., American Tel. & Tel.*, 833 F.Supp. at 988–89; *Colonial Life Ins. Co. v. Electronic Data Sys.*, 817 F.Supp. 235, 240–41 (D.N.H.1993); *McKernan v. United Technologies Corp.*, 717 F.Supp. 60, 69 (D.Conn.1989); *Xerox Corp. v. Hawkes*, 124 N.H. 610, 475 A.2d 7, 10 (1984); *Schurtz v. BMW of North Am.*, 814 P.2d 1108, 1115 (Utah 1991). Incidental damages may be recovered, even when consequential damages are excluded, if the terms of the contract so provide. *See, e.g., Carbo*

*Indus. v. Becker Chevrolet*, 112 A.D.2d 336, 491 N.Y.S.2d 786, 790 (2d Dep't 1985) (finding incidental damages compensable despite contract clause excluding consequential damages as clause did not explicitly exclude them). Because we find no basis for distinguishing incidental and consequential damages in either paragraph 360 or the case law, we apply section 2–719 to both forms of damages.

9. There is some support for NYSEG's contention that bad faith is an exception to the enforceability of a consequential damages exclusion under section 2–719(3). *See, e.g., Long Island Lighting*

■ NYSEG does not argue that McNally acted in bad faith by failing to include a provision similar to paragraph 90.2 in Ellwood's subcontract when it first was drafted. Such a claim if made would fail, given that NYSEG possessed the authority under the general contract to approve or reject McNally's choice of subcontractors, because NYSEG either could have required McNally generally to include a paragraph 90.2 provision in any of its subcontracts, or could have vetoed the selection of any subcontractor who would not agree to the work acceleration clause. Rather, NYSEG's bad faith claim rests at bottom on McNally's own failure to comply with paragraph 90.2. Ellwood, however, not McNally, ultimately was responsible for the fabrication of the gates, and McNally could not require Ellwood to provide 24 hour labor because their subcontract did not contain a provision similar to paragraph 90.2. Construing the ambiguities of the provision against NYSEG, who drafted the contract, as we must, see *Guardian Life Ins. Co. v. Schaefer,* 70 N.Y.2d 888, 524 N.Y.S.2d 377, 378, 524 N.Y.S.2d 377, 519 N.E.2d 288 (1987), we read paragraph 90.2 to apply to McNally alone. McNally thus was not required to pay Ellwood's overtime expenses itself, as paragraph 90.2 does not govern work performed by subcontractors.

NYSEG also fails to point to any evidence that suggests McNally's efforts to speed Ellwood's production were undertaken in bad faith. Ellwood experienced delays because of material shortages, manufacturing errors, work stoppages, and its own financial difficulties, and not from any act or omission of McNally's. Instead, McNally on two occasions made advance payments *not required* under its subcontract and otherwise made extensive efforts to encourage Ellwood to speed up production, including the assign-

ment of its own employees to Ellwood's production facility. Significantly, NYSEG was aware of these efforts when they occurred and never complained that they were insufficient under paragraph 90.2, and on one occasion NYSEG itself offered Ellwood's workers a bonus to complete timely the last two gates, an offer Ellwood refused when it could not reach an agreement with its union. Indeed, there can be no dispute that NYSEG was made amply aware of Ellwood's production problems, undercutting NYSEG's claim that McNally willfully concealed the cause of delay from NYSEG. Finally, McNally's failure to disclaim its liability for delay damages until November 1989 did not prevent NYSEG from terminating McNally, as NYSEG had considered ending the contract as early as April but decided not to do so to avoid even greater delays. In short, NYSEG fails to raise a genuine issue whether McNally intentionally avoided its responsibilities under paragraph 90.2.

B. *Breach of a Fundamental Obligation*

■ NYSEG also argues· that McNally's failure to perform under paragraph 90.2 constituted a total default of its contractual obligations. Under New York common law every party to a contract has an affirmative obligation to use its "best efforts" to meet the contract's terms, and NYSEG argues that the breach of this obligation can render unenforceable a provision excluding consequential damages. *See Forward Indus.,* 123 A.D.2d 374, 506 N.Y.S.2d at 455. Without deciding whether such an obligation survives under section 2–719(3) of the UCC, however, we again conclude that NYSEG fails to supply sufficient facts to support this claim.

■ A breach of a fundamental obligation under a contract occurs only where the contract fails *in its essence:* that is, where or-

Co. v. Transamerica Delaval, 646 F.Supp. 1442, 1458 (S.D.N.Y.1986) (stating in dicta that "[a] defendant may be estopped from asserting a contractual limitation of consequential damages [under § 2–719(3)] if the defendant has acted in bad faith"). The exception also might derive from the general obligation of good faith and fair dealing in all contracts, see, e.g., Van Valkenburgh, Nooger & Neville v. Hayden Publishing Co., 30 N.Y.2d 34, 330 N.Y.S.2d 329, 333, 281 N.E.2d 142, 146, cert. denied, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972), or from section

1–203 of the UCC, which states that "[e]very contract or duty within this Act imposes an obligation of good faith in its performance or enforcement." N.Y. U.C.C. § 1–203 (McKinney 1993); see also M. O'Neil Supply Co. v. Petroleum Heat & Power Co., 280 N.Y. 50, 54, 19 N.E.2d 676 (1939) (under common law). We need not resolve the source or viability of the bad faith exception, however, because we find that NYSEG fails to raise a genuine issue of material fact as to McNally's bad faith under any theory.

dered goods are not delivered at all or are delivered with significant faults rendering them inoperable. *See id.,* 123 A.D.2d 374, 506 N.Y.S.2d at 455–56; *see also RRX Indus.,* 772 F.2d at 546 (finding failure of fundamental obligation under contract where computer software delivered by seller was rendered inoperable because of "bugs" in programs). NYSEG makes no allegation that the gates McNally delivered were inoperable or defective, or that their delay caused material damage to the entire project. Rather, the gates performed as warranted and the project was completed within the deadline of its construction permit. McNally's performance therefore did not constitute a failure of a fundamental obligation under the contract.[10]

## V

■ Finally, NYSEG argues that the district court improperly calculated prejudgment interest from the end of the grace period for each unpaid invoice. NYSEG argues that McNally's right to prejudgment interest did not accrue while a good faith dispute existed concerning McNally's entitlement to payment. N.Y.Civ.Prac.L. & R. § 5001(b) (McKinney 1992), however, states that a party is entitled to prejudgment interest "computed from the earliest ascertainable date the cause of action existed." *See also* N.Y. U.C.C. §§ 2–709, 2–710 (McKinney 1993). The "earliest possible date" in contract actions arises when the alleged breach occurred, regardless of the parties' states of mind or subsequent discussions. *See Sobiech v. International Staple & Mach.,* 867 F.2d 778, 781 (2d Cir.1989). The district court therefore correctly calculated prejudgment interest.

## CONCLUSION

For the reasons stated above, we affirm the judgment of the district court.

---

**10.** In a related argument NYSEG asserts that McNally cannot recover on the contract because it was not free from fault in its performance. *See Created Gemstones v. Union Carbide Corp.,* 47 N.Y.2d 250, 417 N.Y.S.2d 905, 907, 391 N.E.2d 987, 989 (1979). The rule of *Created Gemstones* applies, however, in situations where there exists a *valid* counterclaim. No valid counterclaim exists here, and therefore the district court correctly found for McNally on its complaint.